## IN RE TRUST KNOWN AS
## GREAT NORTHERN IRON ORE PROPERTIES.*

243 N. W. 2d 302.

April 23, 1976—Nos. 44775, 44776.

---

* Certiorari denied sub nom. Arms v. Watson, 429 U. S. 1001, 97 S. Ct. 530, 50 L. ed. 2d 612 (1976).

*Briggs & Morgan, J. Neil Morton, Richard E. Kyle, Steve A. Brand, Frank S. Farrell, Richard V. Wicka,* and *Kurt W. Kroschel,* for appellant Burlington Northern.

*Doherty, Rumble & Butler, Francis D. Butler, Jack C. Foote, Frank Claybourne,* and *Perry M. Wilson, Jr.,* for appellant trustees.

*Arter & Hadden, Thomas V. Koykka, David G. Coleman, Oppenheimer, Wolff, Foster, Shepard & Donnelly, James R. Oppenheimer,* and *John H. Wolf,* for respondents Arms.

PETERSON, JUSTICE.

The trustees of a trust known as Great Northern Iron Ore Properties petitioned the district court for instructions as to their powers and duties with respect to the conversion of the assets of the trust to cash.[1] The trust instrument directs that upon termination of the trust the trustees shall convey all remaining money to the beneficiaries and convey all other property back to the settlor or to its successor. The petition was prompted by a dispute between certain owners of the beneficial interest of

---

[1] The trustees additionally petitioned for confirmation of their appointment and allowance of their accounts. These were confirmed and allowed and are not now in issue.

the trust and the successor in interest of the settlor.[2] The district court did not give the requested instructions but, instead, declared the trust terminated and ordered that the trust assets be transferred to a corporation to be owned by the beneficiaries. We reverse and remand for further proceedings to permit the instructions for which the trustees petitioned.

Near the turn of the century, James J. Hill and others acquired stock in several companies which owned iron ore properties in Minnesota. Hill caused the stock in these mining properties to be transferred to the Lake Superior Company, Limited (hereafter Lake Superior), a Michigan partnership composed of Hill and some of his associates, and on October 20, 1899, Lake Superior entered into a contract with Great Northern Railway (hereafter Great Northern). By this contract Lake Superior "in consideration of" and "as a condition [of]" the transfer of property to it, agreed not to sell any of the property without the approval of Great Northern and agreed that, when directed by Great Northern, it would pay the net income from that property to the shareholders of Great Northern as they appeared of record for regular dividend purposes. Lake Superior agreed, in addition, that Great Northern could direct it in the acquisition of new property and that, at Great Northern's direction, Lake Superior would transfer the property to whomever Great Northern, upon majority vote of Great Northern stockholders, should at any time designate.

Great Northern, by resolution passed by its directors and approved by its shareholders in November 1906, ordered Lake Superior to transfer its assets to named trustees. The assets were

---

[2] Several parties intervened, principally appellant Burlington Northern, Inc., and respondents Charles S. and Elizabeth P. Arms. Burlington Northern is the successor in interest of the settlor of this trust. Respondents Arms are two of the holders of certificates of beneficial interest in the trust. They do not represent the interests of any of the other approximately 10,000 certificate holders.

conveyed to the trustees by a trust instrument dated December 7, 1906, the trust now in issue.

The terms of the trust give the trustees a full power of sale over the property, as well as the power to reinvest in other property. It requires the trustees from time to time and at least once a year to distribute such portion of the net income from the property as they might deem proper to the persons registered as shareholders of Great Northern on December 6, 1906. The total interest of these beneficiaries was divided into 1,500,000 equal shares, each beneficiary receiving the number of shares and a certificate therefor equal to the number of shares of Great Northern stock he owned on December 6, 1906.[3]

The trust is to continue during the lives of 18 specified persons plus an additional 20 years after the death of the last survivor, unless sooner terminated. The trust instrument directs that upon the expiration of the 20 years following the death of the last survivor the trustees are to wind up the affairs of the trust, to pay all trust obligations, and then (a) to distribute all remaining moneys to the certificate holders and (b) to convey back to Lake Superior, or its successors or assigns, all remaining property other than money. In 1913 Lake Superior transferred to Great Northern whatever interest Lake Superior had in the trust. Through merger in 1970, Burlington Northern, Inc., has acquired whatever interest Great Northern as successor of Lake Superior had in the trust. The district court found that the purpose of the trust had been accomplished; that the trust should be terminated; and that Burlington Northern had no real interest in the trust. The court instructed the trustees that all property, both money and otherwise, should eventually be transferred to the certificate holders. In making the stated findings, the court first concluded that the trust instrument was ambiguous. It accordingly admitted and considered extrinsic evidence consisting of hundreds of pages of documents. We hold that the trust instru-

---

[3] These certificates of interest in the trust are now traded on the New York Stock Exchange.

ment is not ambiguous and that the district court's findings were clearly erroneous.

The scope of our review, as stated in Rule 52.01, Rules of Civil Procedure, is limited to the extent that findings of fact made by a district court should not be set aside unless clearly erroneous, due regard being given to the opportunity of the trial court to judge the credibility of the witnesses. This rule establishes a broader scope of review than that applied to the findings of a jury or an administrative tribunal, for as we said in In re Estate of Balafas, 293 Minn. 94, 96, 198 N. W. 2d 260, 261 (1972), the trial court's findings may be held clearly erroneous, notwithstanding evidence to support such findings, if the reviewing court is left with the definite and firm conviction that a mistake has been made.

The capacity of a reviewing court to independently judge the meaning and effect of documentary evidence has never been clearly articulated by this court. Where, as in this case, the critical evidence is documentary, there is no necessity to defer to the trial court's assessment of the meaning and credibility of that evidence. We have in some cases deferred to the trial court's findings upon such evidence. The Telex Corp. v. Data Products Corp. 271 Minn. 288, 292, 135 N. W. 2d 681, 685 (1965) ; Independent School Dist. No. 877 v. Loberg Plumbing & Heating Co. 266 Minn. 426, 435, 123 N. W. 2d 793, 799 (1963) ; Sommers v. City of St. Paul, 183 Minn. 545, 551, 237 N. W. 427, 430 (1931). In our later cases, however, we have not done so. Midway Center Associates v. Midway Center, Inc. 306 Minn. 352, 237 N. W. 2d 76 (1975). See, also, Northwestern Nat. Bank v. Simons, 308 Minn. 243, 242 N. W. 2d 78 (1976); Metro Office Parks Co. v. Control Data Corp. 295 Minn. 348, 205 N. W. 2d 121 (1973) ; Town & Country Shopping Center v. Swenson Furniture Co. 261 Minn. 100, 104, 110 N. W. 2d 525, 528 (1961). We think that the better rule is that articulated by Judge Jerome Frank in Orvis v. Higgins, 180 F. 2d 537, 539 (2 Cir. 1950):

"* * * Where a trial judge sits without a jury, the rule varies

with the character of the evidence: (a) If he decides a fact issue on written evidence alone, we are as able as he to determine credibility, and so we may disregard his finding. (b) Where the evidence is partly oral and the balance is written or deals with undisputed facts, then we may ignore the trial judge's finding and substitute our own, (1) if the written evidence or some undisputed fact renders the credibility of the oral testimony extremely doubtful, or (2) if the trial judge's finding must rest exclusively on the written evidence or the undisputed facts, so that his evaluation of credibility has no significance. (c) But where the evidence supporting his findings as to any fact issue is entirely oral testimony, we may disturb that finding only in the most unusual circumstances."

Except as the scope of our review may be deemed broader under the rule of In re Estate of Balafas, *supra,* we adopt and approve this articulation.

The first matter the district court ruled on was the duration of the trust. One paragraph of the trust is a uses and trusts clause which provides that the trust shall continue for the lives of 18 named persons plus an additional 20 years, unless sooner determined.[4] A later paragraph provides that upon the expiration of the 20 years following the death of the last survivor of the 18 named persons the trustees shall proceed to wind up the affairs of the trust.[5] The district court found, based on these two

---

[4] The trust instrument is in the form of a conveyance of real property. Following the habendum clause, the uses and trusts clause provides as follows: "IN TRUST, HOWEVER, to hold, use and dispose of the said property and all income and proceeds thereof, upon the trust herein expressed, for and during the lives of the following named persons and the life of the last survivor of them, and for and during the twenty (20) years next following the death of such last survivor, unless said trust shall be sooner determined, the names and description of said persons upon whose lives the duration of said trust is limited, being * * *."

[5] Paragraph 17 of the trust instrument reads: "Upon the expiration of the twenty (20) years next following the death of the last survivor

paragraphs, that the intended duration of the trust is ambiguous and that it is impossible to determine from the face of the trust instrument when the trust should terminate. It found, by resort to extrinsic evidence, that the intent of the settlor was that the trust be terminated before the stated term of 18 lives plus 20 years.

The trust instrument, however, is not ambiguous. The clearly stated intent of the grantor was that the trust continue for the lives of 18 persons plus 20 years, unless for some reason it might be "sooner determined." A provision with respect to "sooner" termination is not uncommon. While it recognizes the possibility of an earlier termination, it does not evince an intent that termination should come before the stated period. Situations which could cause termination sooner include, for example, failure of subject matter, termination by mutual consent of all concerned, and termination by legislative action amending the statutes which regulate trusts. While it is true any one of these situations conceivably could occur before the end of the stated term of 18 lives plus 20 years, and while it is true we cannot therefore ascertain with certainty the time when the trust will in fact be determined, the intent of the settlor is clear. Extrinsic evidence, therefore, may not be permitted to vary the plain meaning expressed in the trust instrument.

Even were the extrinsic evidence upon which the court relied to be considered, it does not, taken as a whole, establish that the settlor's intent was that the trust should be terminated sooner than the expressly stated term of 18 lives plus 20 years. The dis-

---

of the before mentioned persons upon whose lives the said trust is limited, the trustees shall at once proceed to wind up the affairs of said trust. After paying or providing for all expenses or obligations of the trust they shall distribute ratably among the certificate holders all moneys remaining in their hands as such trustees, and shall convey and transfer unto the party of the first part, or its successors or assigns, all property, save said moneys, held by them under said trust.

"And thereupon said trust shall cease."

trict court in effect reformed the written trust instrument because of its finding that the settlor intended the trust to terminate upon the mining out of the "natural" ores. Express provisions of a trust instrument may be reformed if it clearly appears that the settlor was mistaken as to the provisions contained in the instrument it executed. The evidence does not demonstrate such a mistake, however. It indicates at most that the settlor may have been mistaken as to how long the trust properties would continue to be of significant value. Although the natural ores have been exhausted, the properties contain enormously valuable resources of taconite. The record does not show that the settlor, had it fully appreciated the true value of these mineral lands, would have drawn the trust to terminate sooner than the stated term of 18 lives plus 20 years.

The second matter which the district court determined was that Burlington Northern has no interest in the trust. The trust instrument provides that the trustees shall have full power to sell the trust property, exchange it for other property, or otherwise dispose of all or part of it.[6] Another paragraph provides that at the termination of the trust all properties other than money shall be turned over to Lake Superior (the party of the first part), or its successors or assigns (now Burlington Northern).[7] The district court found an inherent ambiguity in these

---

[6] Paragraph 9 of the trust instrument reads: "The trustees shall have full power, during the continuance of this trust, to sell at public or private sale, or exchange for other property, or otherwise dispose of all or any part of the shares of stock hereby transferred to them, or any other property that may have become subject to this trust, and to invest the proceeds of any such sale or sales in other property; and in case of such re-investment the property so acquired, as well as all property acquired by the trustees in exchange, or otherwise, for property held by them under this trust, shall be held by the trustees under the same trust and with the same powers and duties in respect thereto as are hereby provided in respect to the property herein described and conveyed."

[7] See footnote 5, *supra.*

two provisions and again resorted to extrinsic evidence to determine the intent of the settlor. We find no ambiguity in these provisions.

Even if the extrinsic evidence were considered, however, we are not persuaded that the intent of the settlor was other than what was expressed in and incorporated by the trust.[8] The trustees may be given a power of sale over the property, but they are also instructed to turn over to the settlor or its successor whatever property they do not so choose to liquidate. There is no inconsistency in such a power and instruction.

The district court reasoned that no reversion in Lake Superior was intended because such reversion would have caused Great Northern to violate the law and its charter when it engaged in carrying ore mined from the trust properties. The court specifically had in mind the Hepburn Act, the Interstate Commerce Act, and "the tenor of the United States Supreme Court cases covering such matters."

The Commodities Clause of the Hepburn Act, now 49 USCA, § 1(8), upon which the court particularly focused, prohibits a railroad from carrying ore mined or produced by it or under its authority or in which it may have any interest, direct or indirect. It is not clear that immediately after the creation of the trust in 1906 Great Northern's carriage of ore mined from the trust properties would have violated the Hepburn Act, for it is not clear that it would have been deemed to have any interest in the ore. It was not until 1913 that the railroad acquired Lake Superior's interest in the trust, and we are not prepared to say that this transfer 7 years later is controlling in ascertaining the

---

[8] Burlington Northern contends that the settlor intended that the trustees be restricted in their powers not only by the provisions on the face of the trust instrument, but also by certain rules of the common law, which rules were incorporated into the trust by implication. We express no opinion on what rules of common law might have been intended to be incorporated into the trust, for these contentions may be addressed to the trial court upon remand.

intent of the grantor when this trust was drawn. Even if the carriage of the ore were held to be illegal, moreover, it does not follow that this alone would render invalid what is an otherwise valid provision in this trust.

The district court found that if there was to be a reversion of the properties to Lake Superior, it was intended to be no more than a receptacle for worthless properties. From this the court concluded that no reversion was intended at all. Even had the settlor assumed in 1906 that all it should ever expect to receive back was title to virtually worthless, mined-out properties, it did direct that the properties be returned, without regard to what their value might in fact be at the termination of the trust. If these properties have become unexpectedly more valuable today because of improved mining technology, this fact does not change the settlor's expressed intent that the properties be returned when the trust is terminated.

Finally, the district court concluded that any property the trustees returned to Lake Superior or its successor at the termination of the trust would, because of the contract of October 20, 1899, and certain informal communications made by James J. Hill, be held in perpetual trust for the benefit of the shareholders of Great Northern as they appeared on December 6, 1906, or their successors in interest. The court found that the successors in interest of these shareholders are the certificate holders and that they for all intents and purposes hold a fee interest in the trust properties. We disagree.

It is clear that the contract of October 20, 1899, referred to earlier in this opinion, established Lake Superior as the instrumentality of Great Northern. Lake Superior agreed, in consideration of the transfer of property to it, that it would hold and dispose of said property in whatever manner Great Northern might direct. At that time Lake Superior held the property for the benefit of Great Northern, not for the benefit of Great Northern shareholders per se. Great Northern thereafter directed Lake Superior to dispose of the property by conveying

it into a trust, the beneficial interest in which was to be given to the shareholders of Great Northern as they appeared of record on December 6, 1906. We agree that following receipt of this direction Lake Superior could have been said to hold the property for the benefit of the shareholders, in that it was obligated to convey to a trust for the benefit of the shareholders. Indeed, the recitation of the trust instrument executed on December 7, 1906, states that Lake Superior holds the property "for the benefit of the shareholders of The Great Northern Railway Company." [9]

It does not follow, however, that any property the trustees are to return to Lake Superior or its successor in the future will be held for the benefit of the shareholders per se or their successors. Under the contract of 1899 such property would, contrary to the district court's conclusion, be held for the benefit of Great Northern or its successor. In 1913 Great Northern succeeded to Lake Superior's interest in the trust, and Burlington Northern has since succeeded to Great Northern's. Any property returned to Burlington Northern by the trustees would therefore be held only for Burlington Northern's own benefit. The district court's decision, accordingly, must be reversed.

Because it concluded that Burlington Northern had no interest in the trust, the district court did not consider the issues which the trustees sought to resolve by these proceedings—namely, the extent of the trustees' authority to convert trust assets into cash and, if they have such authority, what their duties are with respect to the exercise of that authority. We better fulfill our function as a reviewing court when we review issues after they have been decided below, rather than deciding them ourselves in the

---

[9] This recitation could alternatively have arisen from an imprecise usage of language. Under the terms of the contract of 1899, Lake Superior held the property for the benefit of Great Northern, but Great Northern's interest was in turn held for the benefit of its shareholders. Thus it may be said that, in a manner of speaking, Lake Superior held the property for the benefit of the shareholders even before Great Northern directed that the trust be executed.

first instance. Therefore, we reverse and remand for further proceedings not inconsistent with this opinion.

Reversed and remanded.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.