**In the Matter of the Trust Known as GREAT NORTHERN IRON ORE PROPERTIES.**

Nos. 50845, 50879 and 50914.

Supreme Court of Minnesota.

Oct. 30, 1981.

Doherty, Rumble & Butler, Jack Foote, Frank Claybourne, John Yilek, St. Paul, for appellant trustees.

Charles Howard, Minneapolis, for Charles Howard, et al.

Arter & Hadden and Thomas Koykka and William Burton, Cleveland, Ohio, Oppenheimer, Wolff, Foster, Shepard & Donnelly and David Donnelly, St. Paul, for C. Arms, et al.

Briggs & Morgan and Frank Hammond, Frank Farrell and Richard Wicka, St. Paul, for Burlington Northern.

Harold Siegel, Minneapolis, for M. Siegel.

PETERSON, Justice.

On this appeal, the third in the course of the litigation concerning the trust known as Great Northern Iron Ore Properties, we are asked to review the district court's order directing the trust to pay attorney fees and expenses of various parties in the total amount of $1,827,212.32. We affirm in part and reverse in part.

The trust known as Great Northern Iron Ore Properties was established in 1906 by Lake Superior Company, Ltd., a partnership comprised of James J. Hill and several associates.[1] The trust holds several thousand acres of Minnesota land containing great reserves of taconite. In 1972 the trustees of the trust, prompted by conflicting demands of the successive beneficiaries, petitioned the district court for instructions regarding their powers and duties to convert trust assets to cash for distribution to the income beneficiaries before the termination of the trust. Charles S. Arms and Elizabeth P. Arms (the Arms), income beneficiaries of the trust, and Burlington Northern, Inc., the reversioner, intervened in the action. The Arms sought to compel the trustees to mine the trust lands to exhaustion before the termination of the trust or, if that proved impossible, to convert the trust assets to cash and distribute the proceeds to the income beneficiaries. Burlington Northern claimed the trustees were obligated to continue to mine the trust lands in an orderly fashion, preserving for the reversioner the property remaining at the time of the trust's termination.

Another income beneficiary of the trust, Margot Siegel, filed an objection to that

---

1. For a detailed description of the enterprise and a more complete explanation of the matters at issue in this litigation, *see In re Trust Known as Great Northern Iron Ore Properties*, 263 N.W.2d 610 (Minn.), *cert. denied, Arms v. Watson*, 439 U.S. 835, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978) (*Great Northern II*); *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302, *cert. denied, Arms v. Watson*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976) (*Great Northern I*); 5 Wm. Mitchell L.Rev. 541 (1979).

part of the Arms' petition in which they sought to have the proceedings treated as a class action. Margot Siegel also requested that the trustees' final accounts not be allowed, that they be ordered to disperse current excess assets to the income beneficiaries, and that the reversionary clause of the trust be declared void as against public policy.

Hearings on the matter were held during the summer of 1973. In November 1973 the district court declared the trust terminated and ordered the trust assets transferred to a corporation to be owned by the income beneficiaries. Burlington Northern and the trustees then appealed to this court. In an opinion issued in April 1976 we held clearly erroneous the district court's findings that the trust should be terminated and that Burlington Northern had no real interest in the trust. Accordingly, we reversed the district court's order and remanded the matter for issuance of the instructions the trustees had requested. *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302, *cert. denied, Arms v. Watson*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976) (*Great Northern I*). In July 1976 we denied the Arms' and Burlington Northern's petitions for rehearing. In December 1976 the United States Supreme Court denied the Arms' petition for writ of certiorari. *Id.*

Upon remand the district court instructed the trustees that they have the power and, indeed, the duty to convert all trust assets to cash for the benefit of the income beneficiaries before the termination of the trust. Burlington Northern again appealed to this court. In February 1978 we reversed the district court's order and directed the district court to instruct the trustees that they have the discretionary power to convert trust assets to cash, limited by a duty to serve impartially the interests of both the income beneficiaries and the reversioner. *In re Trust Known as Great Northern Iron Ore Properties*, 263 N.W.2d 610 (Minn.), *cert. denied, Arms v. Watson*, 439 U.S. 835, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978) (*Great Northern II*). The United States Supreme Court denied the Arms' petition for writ of certiorari in October 1978. *Id.*

In March 1979 the district court issued an order instructing the trustees in accordance with our directions in *Great Northern II*. The Arms, Margot Siegel and Burlington Northern thereafter filed with the trial court applications for orders directing the trust to pay their attorney fees and expenses. Arter and Hadden, a Cleveland, Ohio, law firm that represented the Arms, sought an allowance of $1,009,930.69 for its services, costs and disbursements. Oppenheimer, Wolff, Foster, Shepard and Donnelly, the Arms' local counsel, requested $56,193.67. Burlington Northern applied for an allowance of $1,766,270.11 for the services of its house counsel and the law firm that represented it, Briggs and Morgan, and for its expenses. Harold Siegel, the attorney who represented Margot Siegel, requested $34,025 for his services and disbursements.

Charles B. Howard and Dorothy L. Howard, income beneficiaries of the trust, made a motion to be included as parties to the action for the purpose of opposing the applications for allowances of attorney fees and expenses from the trust. The district court granted the motion. The Howards later requested that the trust be directed to pay them $10,447.62 for the attorney fees and expenses they incurred in opposing the applications.

The district court found that the Arms and Burlington Northern had conferred a substantial benefit upon the trust. Their efforts in the litigation had resulted in "clear and precise answers" to the questions raised in the trustees' petition for instructions and had thus enabled the trustees to "protect the interests of the [income beneficiaries] and reversioner definitively until the Trust is terminated." The district court also found that Margot Siegel's objections had benefited the trust. The district court ordered the trust to make payments for attorney fees and expenses as follows: to Arter and Hadden, $965,354.17; to Oppenheimer, Wolff, Foster, Shepard and Donnelly, $129,361.17; to Burlington Northern, for its house counsel, $208,600, and for Briggs

and Morgan, $522,434.48; and to Harold Siegel, $1,462.50. The district court denied the Howards an allowance.

The following parties now challenge the district court's order: the trustees, who argue, first, that the trust may not be required to pay the attorney fees and expenses of any other party and, second, that if the trust may be so required, the amounts the district court allowed are excessive; Burlington Northern and Margot Siegel, who contend the amounts allowed for their attorney fees and expenses are inadequate; and the Howards, who claim the trust should be directed to pay their attorney fees and expenses.

1. The circumstances in which a party may be allowed attorney fees and expenses from a trust are best described by reference to *In re Living Trust Created by Atwood*, 227 Minn. 495, 501, 35 N.W.2d 736, 740 (1949):

> In the sound and cautiously exercised discretion of the court, and not as a matter of right, attorneys' fees and other expenses reasonably and necessarily incurred by all necessary parties to litigation may be allowed and properly charged to the trust estate where such litigation, with respect to substantial and material issues, is necessary in order to resolve the meaning and legal effect of ambiguous language used by the settlor in the trust instrument, if an adjudication thereof is essential to a proper administration of the trust, and if, without unnecessary expense or delay, the litigation is conducted in good faith for the primary benefit of the trust as a whole.

In the present case, the trustees argue, the standard set forth in *Atwood* is not met.

■ The trustees first urge that the Arms, Margot Siegel and Burlington Northern may not be allowed attorney fees and expenses from the trust because this litigation was not "necessary in order to resolve the meaning and legal effect of ambiguous language used by the settlor in the trust instrument." In support of their argument the trustees point to the fact that this court has twice declared the trust instrument un-

ambiguous. *Great Northern II*, 263 N.W.2d at 616; *Great Northern I*, 308 Minn. at 224–25, 243 N.W.2d at 305. The final determination that the trust instrument is unambiguous need not, in our view, preclude the allowance of attorney fees and expenses from the trust in this case. The trust instrument was sufficiently ambiguous to require litigation to establish its meaning and legal effect. *See In re Campbell's Trusts*, 258 N.W.2d 856, 868 (Minn.1977). Nothing in the record persuades us that the contrary positions of the Arms and Margot Siegel on the one hand and Burlington Northern on the other were not the result of an honest difference of opinion. Their opposing contentions produced a reasonable doubt regarding the legal effect of the trust instrument and presented an issue that, in view of the approaching termination of the trust, demanded expeditious resolution.

Second, the trustees argue that the allowances for attorney fees and expenses are not justified because no attorney fees or expenses have been "incurred" by the Arms or Margot Siegel or by Burlington Northern with, respect to the services of its house counsel.

■ At the hearing on the applications for attorney fees and expenses, counsel for the Arms and Margot Siegel admitted they do not expect to be compensated for their services unless compensation is allowed them from the trust. The trustees contend that because the Arms and Margot Siegel are not now obligated to pay for their attorney services, they have incurred no attorney fees in the course of this litigation. We reject this argument. In *City of Minnetonka v. Carlson*, 265 N.W.2d 205 (Minn.1978), the appellant landowners had entered into a contingent fee arrangement with the attorney representing them in condemnation proceedings. That the appellants had no out-of-pocket legal expenses did not preclude them from recovering attorney fees pursuant to the statute permitting such recovery upon the municipality's abandonment of the condemnation proceedings. *Id.* at 207. That the Arms and Margot Siegel are not obligated to pay attorney fees and

expenses should not preclude the allowances they request. The public policy in favor of permitting a beneficiary to challenge the questionable use of trust assets would be poorly served if, in a case so complex as this one, we were to require that he establish personal liability for attorney fees and expenses as a condition precedent to receiving an allowance for them from the trust. *See St. Paul Electrical Workers Welfare Fund v. Cartier*, 288 Minn. 483, 182 N.W.2d 187 (1970).

The trustees argue that Burlington Northern has incurred no attorney fees with respect to the services of its house counsel because it was not constrained to increase their number as a result of its participation in this litigation. Burlington Northern need not establish that it incurred additional expenses with respect to the employment of house counsel in order to justify an allowance for their services from the trust. Burlington Northern's house counsel were engaged in this litigation; therefore, *Atwood's* requirement that attorney fees have been "incurred" is sufficiently met.

The trustees finally contend that this litigation was not conducted "for the primary benefit of the trust as a whole" because it was in essence a contest between successive beneficiaries of the trust in the course of which the trustees remained neutral. In *Atwood* we noted that "a bona fide clash of divergent views, coupled with the production of evidence and a presentation of oral and written argument pro and con, is of great value to any genuine adjudication and is of benefit to the entire trust." 227 Minn. at 502, 35 N.W.2d at 740. The district court found that the Arms and Burlington Northern had conferred a benefit upon the trust because their participation in the litigation had aided the development of "clear and precise answers" to the questions raised in the trustees' petition for instructions and had thus enabled the trustees to protect the interests of all beneficiaries until the termination of the trust. The record contains nothing indicating that this finding was in error. The questions in controversy in this case affected the rights of all

beneficiaries of the trust. The resolution of those questions will guide the trustees in the future performance of their duties.

2. Having determined that the district court did not abuse its discretion in allowing the Arms, Margot Siegel and Burlington Northern to recover attorney fees and expenses from the trust, we must next decide whether the specific amounts allowed them are reasonable. There are several factors that a court setting allowances for attorney fees and expenses should consider: (1) the character, ability and experience of the attorneys; (2) the responsibilities they assumed; (3) the difficulty of the issues raised; (4) the time, labor and skill required; (5) customary fees for similar services; (6) the amount involved; and (7) the results obtained. *In re Estate of Bush*, 304 Minn. 105, 119–20, 230 N.W.2d 33, 41–42 (1975); *Atwood*, 227 Minn. at 502, 35 N.W.2d at 741. Additionally, in a case such as this, the court must approach its determination with caution and heed its independent responsibility to protect trusts from unnecessary dissipation. *Atwood*, 227 Minn. at 502, 35 N.W.2d at 741; *see In re Campbell's Trusts*, 258 N.W.2d at 868. The compensation allowed under *Atwood* is for attorney fees and expenses "reasonably and necessarily incurred." 227 Minn. at 500, 35 N.W.2d at 740. No compensation may be given for services that were inessential to the benefit conferred upon the trust.

The district court heard expert testimony regarding the value of the legal services rendered in this case and applied an "hours × hourly rate" formula to establish allowances for attorney fees. The resulting allowances for the attorney fees and expenses of the Arms and Burlington Northern totaled $1,825,749.82. In a case such as this, a formula may be helpful in setting allowances for attorney fees. The formula must, however, produce allowances that are reasonable in light of the guidelines we have indicated. The allowances for the attorney fees and expenses of the Arms and Burlington Northern are unreasonable and clearly excessive.

■ In allowing $1,094,715.34 for the Arms' attorney fees and expenses, the district court gave insufficient weight to the fact that the Arms stood to profit personally from a resolution of the controversy in their favor. The Arms may be allowed some compensation for their attorney fees and expenses because their participation in this litigation aided the determination that the trust instrument was unambiguous. Their participation was motivated, however, by a desire to see the trust terminated and its enormously valuable assets liquidated for distribution to the income beneficiaries.[2] The adherence to this purpose resulted in needlessly protracted litigation. This lawsuit consumed eight years and included two petitions for writ of certiorari to the United States Supreme Court. Under these circumstances, no allowance in excess of $500,000 for the attorney fees and expenses of the Arms is justifiable.

■ Included in the total allowance for the Arms' attorney fees and expenses is an allowance of $127,063.25 for the Arms' local counsel. We take particular note of this allowance because it far exceeds the $56,193.67 the Arms' local counsel requested. The amount requested establishes the upper limit of the amount the Arms may be allowed upon remand for the attorney fees and expenses of their local counsel.

■ The district court allowed Burlington Northern attorney fees and expenses of $731,034.48 from the trust, including $208,600 for the services of its house counsel and $522,434.48 for the services and disbursements of the law firm that represented it. In seeking a proper construction of the trust instrument, the trustees were obligated to insure that the interest of Burlington Northern as the reversioner was adequately protected. Burlington Northern's participation in the litigation enabled the trustees to assume a less active role than they might otherwise have done; nevertheless, the fact remains that Burlington Northern's partici-

pation was voluntary. Burlington Northern may be allowed for its attorney fees and expenses an amount no greater than the amount the Arms are allowed upon remand. With respect to its house counsel, Burlington Northern may be allowed no more than the amount reasonably allocable to the employment of house counsel during this litigation.

■ The district court allowed Margot Siegel $1,462.50 for the services rendered by her attorney, Harold Siegel, in objecting, at the outset of this litigation, to the Arms' petition to have the matter treated as a class action. We discern no error in the district court's findings that in subsequent proceedings Harold Siegel appeared only as "an observer and auditor" and conferred no further benefit upon the trust. The district court did not abuse its discretion in denying Margot Siegel an allowance for attorney fees and expenses greater than $1,462.50.

■ The Howards, income beneficiaries who intervened in the action for the purpose of opposing the applications for attorney fees and expenses, challenge the district court's refusal to permit them an allowance from the trust for their own attorney fees and expenses. We recognize that attorney fees and expenses are not allowed from a trust as a matter of right. Nevertheless, the valuable services performed by the Howards make the denial of all compensation to them inappropriate. Attorney fees and expenses in excess of $2,800,000 were sought from the trust. The Howards' opposition to the applications served the interests of all income beneficiaries. That the trustees also opposed the applications may affect the amount allowed the Howards, but it does not mean that they may be allowed nothing at all.

3. The final issue raised by this appeal is whether the allowances for attorney fees and expenses are to be charged against trust income or principal.[3] The statute gov-

---

2. In this connection, we observe, the district court's allowance for the Arms' attorney fees and expenses far exceeded the value of their interest in the trust.

3. The district court did not address this issue. We recognize that we better perform our function as an appellate court when we review issues after they have been decided below. In

erning the allocation of trust expenses provides in relevant part:

A trust shall be administered with due regard to the respective interests of income beneficiaries and remaindermen. A trust is so administered with respect to the allocation of receipts and expenditures if a receipt is credited or an expenditure is charged to income or principal or partly to each

(a) in accordance with the terms of the trust instrument, notwithstanding contrary provisions of sections 501.48 to 501.63;

(b) in the absence of any contrary terms of the trust instrument, in accordance with the provisions of sections 501.48 to 501.63.

Minn.Stat. § 501.49, subd. 1 (1980). The trust instrument directs the trustees to pay the expenses of the trust out of trust income or principal.[4] Since neither income nor principal is specifically designated for payment of attorney fees and expenses, Minn.Stat. §§ 501.48–.63 (1980) must be consulted. Section 501.59, subd. 1(c), provides that "[c]ourt costs, attorney's fees, and other fees on accountings or judicial proceedings" shall be charged against income "if the matter primarily concerns the income interest" and "unless the court directs otherwise." Section 501.59, subd. 3(a), provides that "court costs and attorney's fees primarily concerning matters of principal" are to be charged against principal.

■ This litigation primarily concerned the proper disposition of the trust principal. Therefore, allowances for attorney fees and expenses must be charged against the trust principal. In effect, the income beneficiar-

ies and the reversioner will share the costs of this litigation.

Affirmed in part, reversed in part, and remanded with directions.

SHERAN, Chief Justice (dissenting).

I would not allow attorneys' fees to the attorneys for Charles S. Arms and Elizabeth P. Arms. The Arms' objective in this litigation was to force liquidation of the trust and compel distribution to the income beneficiaries. Had they succeeded, their attorneys would have received a substantial contingent fee. It was to be anticipated that if they lost, their attorneys would not be paid. I can see no reason why the trust which they put under seige should be burdened with the payment of fees for the attackers as well as the defenders of the trust. I disagree with the assumption that the Arms' assault on the trust was conducted "for the primary benefit of the trust as a whole" within the meaning of *In re Living Trust Created by Atwood*, 227 Minn. 495, 35 N.W.2d 736 (1949).

OTIS, Justice (dissenting).

I join the dissent of Chief Justice Sheran.

WAHL, Justice (dissenting).

I join the dissent of Chief Justice Sheran.

AMDAHL, Justice (dissenting).

I join the dissent of Chief Justice Sheran.

---

order to accelerate an end to this case, however, our immediate consideration of this issue is appropriate.

4. The trust instrument provides:

2. Said trustees shall, at all times, while holding said shares or any of them or any property subject to this trust, collect and receive all dividends declared upon such shares, and all other moneys that may accrue to them, or to which they may become entitled as holders of such shares or property.

3. Said trustees shall, out of the moneys so received by them, or out of the proceeds of any sales made by them of any of said shares, pay all expenses of said trust, including taxes, if any, and the compensation hereinafter provided to themselves as trustees. And in no event shall they have recourse to the certificate holders mentioned for the payment of any part of such expenses or payments or any liability incurred by said trustees.

The shares referred to were shares of stock in the proprietary companies.