Gerald PLAISTED, et al., Respondents,

v.

Arlan W. FUHR, et al., Appellants.

No. C1–84–1649.

Court of Appeals of Minnesota.

April 23, 1985.

Ronald C. Anderson, Hulstrand, Anderson, Larson & Boylan, Willmar, for respondents.

Curtis D. Forslund, Betsy B. Baker, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, John D. Schnobrich, Estebo, Schnobrich & Frank, Ltd., Redwood Falls, for appellants.

Heard, considered and decided by FORSBERG, P.J., and PARKER and LANSING, JJ.

## OPINION

FORSBERG, Judge.

This appeal is from a judgment for specific performance of a purchase agreement for the sale of residential property, entered against the Fuhrs as vendees. The Fuhrs contend that two of the contingencies in the agreement, mortgage financing and an easement agreement, were not met, and that specific performance should not have been ordered. We reverse.

## FACTS

Respondents Dr. and Mrs. Plaisted owned a house on a large tract of land located on a point of Foot Lake, within the city limits of Willmar. The Plaisteds in 1980 decided to sell their home and subdivide their land (Tract A and Tract B) so they could build a smaller house for themselves on Tract B. Tract A, with the existing Plaisted residence, was listed with the realtor in 1982, and shown to the Fuhrs on February 1, 1983.

The Plaisted property consisted of the easterly Tract B, through which the gravel drive entered which provided the only access to the property, the westerly Tract A, including the existing residence and ga-

rage, and an extension of Tract B lying south of Tract A, which the Plaisteds also proposed to retain. The property is shown on the plat map as follows:

On February 1, Dr. Fuhr went over the south and east lines of Tract A with the Plaisteds' realtor, Jan Hillstrom. He understood that the Plaisteds were retaining an area to the south of Tract A, an area referred to at trial as the "green area," to distinguish it from the rest of Tract B.

As is evident from the plat shown above, the vendees would require an easement on the gravel drive located on Tract B to gain access to Tract A. Accordingly, when the Purchase Agreement was signed, on February 8, the following contingency was added:

III. A perpetual agreement between sellers and buyers concerning a driveway easement and driveway maintenance to be provided by seller's attorney.

Exh. 2.

The agreement also included a contingency for a $135,000, 30-year mortgage:

This agreement is contingent upon both the buyer and property qualifying for above mentioned mortgage on or before 5-1-83. In the event the * * * mortgage cannot be secured, this agreement shall become null and void * * *.

The Fuhrs applied for mortgage financing at First National Bank of Willmar, and an appraisal was made on February 23. Due to the large amount of the loan, referred to as a "jumbo" mortgage because it exceeded FHMA and FNMA dollar limits, the bank's loan officer testified it would have to sell the mortgage in the secondary market. Therefore, the bank was concerned that the requirements of secondary purchasers be satisfied, including a satisfactory easement agreement. The bank's requirements for financing focused on the easement agreement, since both the Fuhrs and the property appraisal easily qualified.

The Plaisteds' attorney submitted a proposed easement agreement around the first of March. This first draft included the following features:

1) reciprocal easement giving the Plaisteds access to Tract A;

2) shared costs of driveway maintenance;

3) termination of easement if the Fuhrs did not pay their share of costs;

4) no legal description of the easement itself;

5) no easement for utilities installation or maintenance.

The bank's real estate loan officer, Val Young, reviewed this draft, and noted three concerns: the termination provision, lack of a legal description, and lack of a utilities easement. He called the Fuhrs' real estate agent, told her his reservations, and suggested that the Fuhrs should have legal counsel.

The Fuhrs contacted an attorney who drafted a counter-proposal. This draft met the bank's three concerns, and deleted the Plaisteds' right of access to Tract A. The proposed easement reserved the Plaisteds' driveway rights on Tract B, except for the "green area" south of Tract A, which was not to be used

for the purpose of providing ingress and egress to properties lying westerly of [Tract A].

The Plaisteds owned an interest in a lot to the west of Tract A. This lot was located on a cul-de-sac, with no access to the driveway, but the Fuhrs became concerned about a possible use of the driveway for access.

The Plaisteds and Fuhrs met on April 6. The Fuhrs' concerns centered on the "green area," both its use as access to the westerly Plaisted lot, and the general plans for its future use. Plaisted told the Fuhrs he would give them the first option to buy the area, if he decided to sell.

Plaisted's second proposed easement, submitted sometime in early April, added a utilities easement, but did not address any of the other issues raised by the Fuhr proposal, nor any of the other concerns raised by the bank. This draft retained the provision for possible termination of the easement.

The Fuhrs responded with a letter, dated April 15, enclosing a counter-proposal and requiring the Plaisteds to agree to this proposal within 4 days or the purchase agreement would be terminated. The proposed easement provided that the Plaisteds would have personal access only to the "green area" and that they would not build on it without the Fuhrs' consent.

Dr. Plaisted met with Dr. Fuhr on April 18, and they agreed to obtain an appraisal of the "green area" for a sale to the Fuhrs. The appraisal, however, was for an "unbuildable lot." The Fuhrs insisted on a sale without restrictions on their ability to build on the "green area." The Plaisteds, however, submitted a draft easement and deed restricting the Fuhrs from building on the lot.

The Fuhrs closed on their old house in Redwood Falls on April 26. Fuhr called Plaisted from the closing to discuss their differences, and suggested that they terminate the deal. Fuhr claimed that Plaisted concurred, but he denied this.

The parties then exchanged letters, the Fuhrs claiming mutual termination, the Plaisteds contending the contract was still valid. An April 28 meeting between Plaisted and the realtors resulted in a concession that the Fuhrs could build a garage or utility shed on the "green area," but this was not acceptable to them.

The May 1 financing deadline passed with no loan commitment. The Fuhrs at some point began looking for alternative housing, and committed to the construction of a new house. The Plaisteds sued for specific performance of the contract on May 11.

An advisory jury was empaneled which made the following findings:

1) The Fuhrs did not make a good faith effort to obtain financing;

2) The proposed sale of the "green area" was separate from the easement agreement;

3) There was no mutual agreement to terminate the contract; and

4) A "perpetual agreement" was reached on the driveway easement.

The trial court, adopting these findings, and making findings of its own, ordered specific performance of the purchase agreement, and the sale to the Fuhrs of the "green area."

## ISSUE

Did the Fuhrs make a good faith effort to obtain mortgage financing?

## DISCUSSION

■ The Fuhrs made written application for mortgage financing at First Bank Willmar, and claimed to have inquired at two other banks. Since their written application was still pending on May 1, they were not required to make a second application. *See Katz v. Chatelain*, 321 So.2d 802 (La.App.1975). The bank had not at any time rejected the application. *Cf., Brewster v. Yockey*, 153 So.2d 489 (La.App.1963).

■ The trial court in its findings and memorandum noted a number of factors relating to good faith, including the failure of the Fuhrs to apply to more than one lender or to seek an extension of the May 1 financing deadline. We can find no duty either to make multiple applications or to waive a financing deadline imposed for the benefit of both parties. *See*, Annot., 78 A.L.R.3d 880 (1977).

Thus, the good faith in which the Fuhrs were found lacking was solely concerned with their conduct in negotiations for an easement agreement which would be satisfactory to the bank, which was a prerequisite to financing. An analysis of the easement negotiations does not support the finding that the Fuhrs did not show good faith in attempting to reach such an agreement. The failure of these negotiations must be attributed to both parties. Neither the chronology of the negotiations nor an analysis of the impasse reached over the "green area" supports the jury's finding, adopted by the trial court. That finding lacks sufficient support in the evidence and

was clearly erroneous. *Gruenhagen v. Larson*, 310 Minn. 454, 246 N.W.2d 565 (1976).

■ We believe that the easement and financing contingencies imposed upon both parties a duty of good faith in negotiating an easement agreement acceptable to a prospective lender. *See generally* 2 Restatement of Contracts 2d § 205. The buyers cannot have the exclusive right to determine whether financing can be or has been obtained without making illusory the promise to purchase. *Nodolf v. Nelson*, 103 Wis.2d 656, 309 N.W.2d 397 (Wis.App. 1981). Their duty to seek financing in good faith, however, cannot be used to deny the buyers their right to negotiate an acceptable easement.

■ Several points in the chronology of the negotiations must be noted. Since the critical evidence is documentary or undisputed, we need not defer to the trial court's assessment of the meaning and credibility of this evidence. *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 225–6, 243 N.W.2d 302, 305, *cert. denied sub nom. Arms v. Watson*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

■ First, it was the bank's loan officer, Val Young, who first objected to the easement proposed by the Plaisteds, and suggested that the Fuhrs seek legal counsel. There was no evidence to contradict this. In view of the necessity for the bank of selling this mortgage in the secondary market, two objections in particular, the objection to the lack of a utilities easement for property not connected to city sewer, and the objection to the terminable nature of the proposed easement, appear well-founded.

Secondly, the Fuhrs' first easement proposal included a provision on restricting the Plaisteds' access through the "green area." Thus, the "green area" problem, although not logically included within the Tract A easement agreement, was conceived by the Fuhrs as part of the same problem, raised

by the Plaisteds' proposal for a right of access to Tract A itself. The later negotiations over sale of the "green area," therefore, were a natural result of this early conception and not a bad-faith attempt to frustrate an easement agreement.

The jury was asked to determine whether the *purchase* of the "green area" was a separate transaction from the easement itself, thus ignoring the negotiations over *access* to the "green area" which later evolved into the proposed sale.

Thirdly, the Plaisteds' second easement proposal, in early April, still included a provision for termination of the easement, an obvious cause of concern to the bank, and contrary to the contingency requirement of a "perpetual" easement. No proposal offering a non-terminable easement was received until about one week before the May 1 financing deadline, when the Fuhrs were closing on their Redwood Falls house.

Finally, the Plaisteds never submitted a proposed easement which included a legal description of the land to which the easement was granted. The "unconfined" nature of their proposed easement was one of the initial objections noted by the bank.

The Fuhrs were entitled to negotiate an easement acceptable to them and to their prospective lenders. Insofar as the trial court's finding of lack of good faith is based on implied duties to make further loan applications, to seek an extension of the financing deadline, and to refrain from exploring alternative housing, it is clearly erroneous. Insofar as that finding is based on the course of the negotiations themselves, we have concluded, primarily from the written evidence submitted, *In re Trust Known as Great Northern Iron Ore Properties,* that it is not supported by sufficient evidence. *See also Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 441 (Minn.1983) (Standard of review not altered by participation of an advisory jury).

### DECISION

The trial court's finding that the Fuhrs did not exercise good faith in negotiating an easement agreement which would satisfy their prospective lenders by the financing deadline is not supported by sufficient evidence and is clearly erroneous. The purchase agreement expired by its own terms when the financing deadline of May 1 was not met, without bad faith on the part of the Fuhrs as vendees.

Reversed.