**COLUMBIA ASSOCIATES, Respondent,**

v.

**PROPPER OIL COMPANY, Appellant.**

No. C2–86–1258.

Court of Appeals of Minnesota.

March 17, 1987.

John A. Warchol, Brian L. Sobol, Katz, Davis & Manka, Ltd., Minneapolis, for respondent.

Thomas F. Miller, Minneapolis, for appellant.

1. A tax *levied* in one year is *payable* the following year. Here, the lease provides that taxes "payable in 1976" were to be used as the base

Heard, considered and decided by RANDALL, P.J., and FOLEY, JUDGE and WOZNIAK, JJ.

## OPINION

FOLEY, Judge.

Propper Oil Company, d/b/a 10,000 Auto Parts, appeals from a money judgment entered in favor of respondent Columbia Associates for unpaid taxes and utilities under a lease agreement. Propper Oil contends that its obligation as tenant to pay these charges terminated with termination of the lease and vacation of the premises and that if the lease is ambiguous on this point, it should be construed against Columbia, successor to the drafter of the lease agreement. We affirm.

## FACTS

Propper Oil entered into a lease for commercial space in a building owned by Besser & Associates in February 1976. In October 1978, Propper Oil exercised its option to renew the lease through February 28, 1982. Columbia purchased the building in March 1981 and assumed all rights and liabilities of Besser under its lease agreement with Propper Oil. On or about February 28, 1982, Propper Oil vacated the premises.

A dispute arose between the parties over payment of taxes and special assessments and utility costs *levied* against the property in 1981 but not *payable* until 1982.[1] The lease terms at issue provide:

4. The LESSOR agrees to pay all of the real estate taxes and installments of special assessments *levied* against the property so long as they do not exceed $payable in 1976 in a calendar year, this amount being equal to _____ cents per square foot based upon a total net rentable area of 76,033 square feet. In the event such real estate taxes and installments of special assessments exceed this amount in any calendar year, the

figure in computing additional taxes and special assessments. Taxes "payable in 1976" are the equivalent of taxes *levied* in 1975.

excess shall be called additional taxes and special assessments. *The LESSEE agrees to pay its prorata share of such additional taxes and special assessments in the form of additional rent.* As the LESSEE is occupying 39170 square feet of the net rentable building area, the LESSEE shall pay 51.5% of such additional taxes and special assessments.

The annual additional taxes and special assessments due from the LESSEE shall be divided by twelve (12), *and paid monthly along with regular rents.* If the real estate taxes and installments of special assessments for the property have not been determined by the First of January for any year the LESSEE agrees to continue to pay the monthly rental amount that was due the previous month. Then, when the real estate taxes and installments of special assessments are determined, an adjustment retroactive to the First of January will be made in the following month's rental.

The above provisions shall not be effective until January 1, 1977 and the LESSOR shall verify the real estate taxes and installments of special assessments with copies of the actual bills.

\*　　\*　　\*　　\*　　\*　　\*

7 & 8. The lessor shall pay for gas, oil, electricity and water and sewer charges during the term of the lease. LESSEE agrees, however, to pay 51.5% of any increase over said utility charges paid by the LESSOR in the calendar year of 1975 for the entire building \* \* \*. The annual additional utilities due from the LESSEE shall be divided by twelve (12) and *paid monthly along with regular monthly rental payments.* First additional monthly payment for increase costs of utilities will be due on June 1, 1977. LESSOR shall verify the utility costs with copies of the actual billing for both years involved. *LESSOR shall have the right during the term of the lease to install individual electric meters for each tenant located* at [the business address]. LESSOR must advise LESSEE in writing at least sixty (60) days prior to making the change to individual meters. It is mutually agreed that monthly rental payment will be reduced Four Hundred dollars per Month ($400.00) to compensate LESSEE for their direct electricity payment to Northern States Power Company.

(Emphasis supplied.)

Under paragraph 4, Propper Oil is obligated to pay its pro rata share (51.5%) of real estate taxes and assessments *levied* against the property to the extent that such real estate taxes and assessments *exceed* those *payable* in 1976. Taxes and installments of special assessments *payable* in 1976 were $13,095. During 1981, real estate taxes and special assessments of $25,782.80 were *levied* against the property, an increase of $12,687.72 over real estate taxes *payable* in 1976. Columbia claimed that Propper Oil was responsible for 51.5% of that increase or $6,534.18, less payments of $1,089.04, leaving an unpaid balance of $5,445.14.

Paragraph 7 & 8 provides that Propper Oil is obligated to pay its pro rata share of utility charges to the extent these charges exceed utility costs incurred in the base year 1975. The provision also provides that utilities should be paid "with the regular monthly rental payments." In 1981, Columbia paid utility charges of $48,699.70, an increase of $20,060.73 over utility costs incurred in 1975. Columbia sought recovery for 51.5% of that increase or $10,331.28 and for $859.77 in unpaid utility charges incurred in 1980.

Propper Oil denied that it was responsible for the payment of any charges following expiration of the lease and vacation of the premises. During its tenancy, Propper Oil made payments representing its share of additional taxes and special assessments along with monthly rental payments. With the exception of the $859.77 Columbia claimed for 1980 utility charges, Propper Oil also made monthly payments for increased utility charges until it vacated the premises in February 1982.

Donald Propper, president of Propper Oil, testified that when he signed the lease he understood the terminology used and intended to bind Propper Oil to its terms. He acknowledged that the utilities provision, as drafted by Besser, was discussed during negotiations with Columbia representatives but remained unchanged. He further explained:

> [I]t was always the interpretation, at least, my interpretation, and I think even in the way the lease was written, that the term of the lease, *at the end of the term of the lease, that was the extent of our obligation to pay increases in utilities and taxes*, because we assumed the obligation in 1975 when we negotiated the lease for the new rent in 1976 and thereon.

(Emphasis supplied.)

Olaf Lee, real estate manager for Columbia at the time the lease was executed, stated that when exact expenses cannot be established in the year a lease originates, payment of operating expenses is often allowed *after* those expenses are incurred. Lee explained that base rent is established by reference to expenses existing on the property in that particular year, including an amount reflecting taxes and utilities. He also testified that although Columbia paid utility charges as incurred and then recouped the amounts owed from individual tenants the following year, it also had the option under the lease to separately meter individual tenants in the building. If this option had been exercised, Propper Oil would have been required to pay the utility company directly.

The trial court found that under paragraph 4 of the lease, Propper Oil was liable for its pro rata share of taxes and special assessments levied in 1981 but not actually payable until 1982. The trial court further found that under paragraph 7 & 8 of the lease, Propper Oil was liable for its pro rata share of utilities used in 1981 but payable until 1982. Judgment with interest was entered for $16,636.19, representing unpaid utilities incurred in 1980 plus utilities, taxes and special assessments pay-able in 1982. Columbia was also awarded attorney's fees of $4,270.

On appeal, Columbia additionally seeks attorney's fees under a provision of the lease.

## ISSUES

1. Did the trial court err in determining that Propper Oil was obligated to pay its pro rata share of increased taxes and special assessments *levied* on the property during its last year of tenancy but not *payable* until after the lease had terminated and the building had been vacated?

2. Did the trial court err in determining that Propper Oil was obligated to pay its pro rata share of increased utility costs incurred during the last year of tenancy but not payable until after the lease had terminated and the building had been vacated?

## ANALYSIS

Propper Oil did not move for a new trial or amended findings. This court's review is limited to whether the evidence sustains the findings of fact and whether such findings sustain the conclusions of law and the judgment. *See Brakemeier v. Wittek*, 386 N.W.2d 408, 409–10 (Minn.Ct.App.1986).

The focal issue here is interpretation of documentary evidence that is supplemented by oral testimony. In *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302, *cert. denied*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976), the Minnesota Supreme Court set out standards for reviewing a trial court's findings as to the meaning and credibility of documentary evidence:

> Where the evidence is partly oral and the balance is written or deals with undisputed facts, then we may ignore the trial judge's finding and substitute our own, (1) if the written evidence or some undisputed fact renders the credibility of the oral testimony extremely doubtful, or (2) if the trial judge's finding must rest exclusively on the written evidence or the

undisputed facts, so that his evaluation of credibility has no significance.

*Id.* at 225–26, 243 N.W.2d at 305 (quoting *Orvis v. Higgins,* 180 F.2d 537, 539 (2d Cir.1950)). Without reaching the issue, we further note that even if this court determined that the lease provisions are unambiguous and that extrinsic evidence was erroneously admitted, the result in this case would not change.

1. Propper Oil contends that the language "annual additional taxes and special assessments due from the LESSEE shall be divided by twelve (12), and paid monthly along with regular rents" contained within paragraph 4 is the only specific reference as to how increased adjustments are to be paid. In other words, since increased adjustments are to be paid along with monthly rent, expiration of the tenancy and the monthly payments operate to extinguish adjustment payments. In the alternative, Propper Oil argues that the provision is ambiguous and should be construed against Columbia, successor to the drafter of the lease. *See Naftalin v. John Wood Co.,* 263 Minn. 135, 142–43, 116 N.W.2d 91, 97 (1962).

▆ Columbia asserts that the law is clear in Minnesota that when a tenant agrees to pay taxes *levied* during a lease, the tenant is obligated to pay those taxes imposed during the term of the lease, even though the taxes are not due and payable until expiration of the lease term. We agree.

In the early case of *Craig v. Sommers,* 47 Minn. 189, 49 N.W. 742 (1891), the lessee agreed to pay " 'all rates, taxes, levies, or assessments on said premises during continuation of the lease.' " *Id.* at 189, 49 N.W. at 743. The lessee argued that he should not be held responsible for taxes payable after he vacated the premises. The supreme court rejected this argument and stated:

> We think a fair interpretation of the language would make [the lessee] liable for the taxes and assessments which were levied, and *became a fixed liability against the land, during the continu-*

*ance of the original lease,* and these taxes were such. A tenant, under a new lease with similar covenants, could hardly be expected to pay taxes and assessments levied upon the land the year before the commencement of his lease, or after it expired, unless he expressly agreed to do so.

*Id.* at 191, 49 N.W. at 743 (emphasis supplied).

In *Whitney v. Leighton,* 225 Minn. 1, 30 N.W.2d 329 (1947), the lessee covenanted "that he will as additional rent, pay * * * all taxes and assessments * * * which shall during said term be levied, assessed or otherwise imposed upon said demised premises." *Id.* at 10, 30 N.W.2d at 334. The trial court found that the lessee was not liable for taxes levied in 1936 because it had assigned the lease to another entity in December of that year. The supreme court reversed and held the lessee liable for taxes *levied* in 1936, even though it was not in possession when the taxes were *payable* in 1937. In so holding, the supreme court cited *Craig* as controlling authority. *Whitney,* 225 Minn. at 11–12, 30 N.W.2d at 334–35.

Although *Craig* and *Whitney* involved disputes between assignors and assignees of the lessee's interest, the principles that emerge are sufficiently analogous to support Columbia's position in the present case. This result is reinforced by *Kopesky v. Precision Gasket Co.,* 279 Minn. 223, 156 N.W.2d 205 (1968), albeit in slightly different form. In *Kopesky,* the pertinent lease term provided:

> "It is also agreed between lessor and tenant that in case the *taxes paid* by the lessor upon the property of which the within leased premises are a part, shall *in any year or years during the term of this lease* be increased over and above the sum of Twenty-four and 14/100 dollars ($24.14) annually, then the tenant shall pay as part of the annual rental of said premises, for such year or years, in addition to the amount hereinbefore named, an amount equal to such increase.

"*The amount* to be added to the rent thus provided on account of increase of taxes in any year or years *shall be added at the time of rent payment* on or next after the date when penalty or loss of the customary discount begins to accrue for non-payment of such taxes. If the year's taxes are payable in two or more installments, then the amounts to be so added shall be apportioned and paid in the same way."

*Id.* at 223–24, 156 N.W.2d at 205 (emphasis in original).

The tenancy in *Kopesky* terminated in August 1964. The trial court rejected the lessor's claim that she was entitled to taxes "assessed" in 1964 but not payable until 1965. The supreme court affirmed, stating:

If the obligation of the lessee was to pay as additional rent all taxes *levied* and assessed during the term of the lease, *the rental obligation of the tenant would have included the 1964 real estate taxes.* See, *Craig v. Summers,* 47 Minn. 189, 49 N.W. 742; *Merle-Smith v. Minnesota Iron Co.* 195 Minn. 313, 262 N.W. 865; *Whitney v. Leighton,* 225 Minn. 1, 30 N.W.2d 329. But this lease is not so phrased.

*Id.* at 224, 156 N.W.2d at 206 (emphasis supplied). The supreme court then went on to explain:

The reference is to "taxes paid by the lessor * * * during the term of this lease." The additional amount becomes payable at *the time of the rent payment* on or next after the date when penalty or loss of the customary discount begins to accrue for nonpayment of such taxes—a date which must occur, if at all, during the period of the lease. The only way the provision as to the time of payment of the increased rental can be given operative meaning is to tie it to taxes actually *paid* by the lessor (as distinguished from taxes *levied and assessed*) during the term.

*Id.* (emphasis in original).

■ The testimony adduced at trial illustrates that Donald Propper Oil was well versed in real estate matters and understood the difference between taxes *levied* and taxes *payable* at the time the lease was executed. Although paragraph 4 states that payment of increased taxes and special assessments "shall be divided by twelve (12), and paid monthly along with regular rents," the record supports the conclusion that Donald Propper knew that any increase in taxes and special assessments over those payable in 1976 could not be determined until the year after those expenses were incurred. Up until February 1982, Propper Oil had made payments on increased taxes and assessments the year after these charges were incurred.

Even if these payments were made in 12 installments as part of monthly rental payments, it is disingenuous for Propper Oil to now argue that it is not liable for taxes assessed on the building during its occupancy simply because those taxes were not payable until termination of the lease and vacation of the premises. As stated in *Whitney,* "[t]he question is *when the duty arose,* not when it was to be discharged." *Whitney,* 225 Minn. at 15, 30 N.W.2d at 336 (emphasis supplied).

■ 2. A similar rationale supports Columbia's claim for utility charges incurred in 1981 but not payable until 1982. Lee explained that Columbia had two options under paragraph 7 & 8: (1) it could pay utility charges as they were incurred and then seek reimbursement from individual tenants the following year (this was the option utilized in this case); or (2) it could separately meter individual tenants and require each tenant to pay the utility company directly as the charges were incurred.

Had Columbia exercised the second option, there is little doubt that Propper Oil would be liable for unpaid utilities consumed during its tenancy. Simply because payment on these charges was deferred does not mean that Propper Oil is discharged from liability. Columbia is entitled to reimbursement for utilities consumed by Propper Oil during its tenancy even though *payment* of these charges was deferred until after the tenancy termi-

nated. In view of our decision, we find it unnecessary to address Columbia's alternate position based on theories of unjust enrichment and quasi-contract.

### DECISION

The trial court's findings and conclusions of law are sustained by the record. Columbia is awarded $500 in attorney's fees on appeal pursuant to the lease agreement.

Affirmed.