**J.J. BROOKSBANK CO., INC.,**
Appellant,

v.

**BUDGET RENT–A–CAR
CORPORATION,**
Respondent.

No. C6–82–1416.

Supreme Court of Minnesota.

July 29, 1983.

Rehearing Denied Aug. 30, 1983.

Leonard, Street & Deinard, Nancy C. Dreher and James V. Roth, Minneapolis, for appellant.

Robins, Zelle, Larson & Kaplan, James R. Safley and Deborah J. Palmer, Minneapolis, for respondent.

PETERSON, Justice.

Plaintiff, J.J. Brooksbank Co., entered into a licensing agreement with defendant, Budget Rent-A-Car Corporation, in 1962. Certain provisions of the agreement outlined the parties' arrangement for allocating reservation system obligations. The reservation system for Budget and its franchisees has changed over time, creating the present dispute between Budget and Brooksbank over each party's respective obligations. Brooksbank brought a declaratory judgment action to determine the extent of Budget's obligations under the 1962 licensing agreement.

The issue presented is whether the trial court erred in its interpretation and construction of the agreement entered into between Brooksbank and Budget. Both parties alleged error by the trial court— Brooksbank by notice of appeal, Budget by notice of review.

Before examining the trial court's conclusions of law, a brief review of the facts and the agreement is necessary. We essentially paraphrase the trial court's findings of fact, which are supported by the evidence introduced at trial.[1] Budget commenced an automobile rental franchising business in 1960. Brooksbank, by entering into a franchise agreement early in the history of the business, received a licensing agreement more favorable in many respects than later licensees. In particular, the licensing agreement provided for lower monthly per-car service charges, initial franchise fees, and reservation costs than the agreements offered to later licensees. Relevant to each party's obligations are the following provisions:

a. Budget's obligations (Article I):

\* \* \* \* \* \*

C. To spend a minimum of FIFTY PERCENT (50%) of the gross monthly per car service charge paid by all Licensees for advertising, promotion, and reservations for the benefit of all Licensees, allocated on a reasonable basis nationally and locally.

D. To maintain reservations offices in New York City, Los Angeles and Chicago.

E. To forward to LICENSEE all applicable reservations made at BUDGET'S reservations office at no charge to LICENSEE.

---

1. The one exception to this statement is Finding of Fact No. 26, which reads like the trial court's conclusion of law concerning its construction of the 1962 licensing agreement:

 Notwithstanding the added benefits of the present system to [Brooksbank] it is entitled to some reduction in computerized reservation costs. This reduction should not be measured by the percentage of reservations which would be forwarded to plaintiff under a manual system from Budget offices in New York, Chicago, and Los Angeles, in view of the benefits plaintiff has been able to realize from the computerized reservation system. The Court has determined that a ten percent reduction in plaintiff's reservation costs would be equitable in light of all the evidence presented at trial.

 Since we disagree with the trial court's conclusion in this regard, we decline to accept this purported finding of fact, judging as it does the meaning and effect (or perhaps, noneffect) of the agreement. *Cf. In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 225, 243 N.W.2d 302, 305 (1976), *cert. denied sub nom., Arms v. Watson*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976) (no necessity to defer to trial court's assessment of the meaning and effect of documentary evidence).

b. Brooksbank's obligations (Article II):

\* \* \* \* \* \*

C. To take and transmit reservations for all other Licensees at no charge to the recipient except for the cost of transmission by telephone or telegraph.

The obligations were to continue "during the existence of the [agreement]," which was automatically renewable every 5 years, subject to conditions not relevant to the present dispute. The agreement also specified other rights and obligations which have no impact on this declaratory judgment action.

During the 1960's, the reservation system operated on a two-tier network, dependent upon the efforts of both Budget and its licensees. Local licensees would take and transmit reservations to other licensees, generally at the cost of telephone or telegraph charges. Budget would forward reservations received by its offices in Chicago, Los Angeles, and New York to applicable licensees. As the automobile rental business grew, Budget increasingly centralized its operations in Chicago, hiring additional staff, adding in- and out-bound WATS lines, and lengthening hours and days of service to the public. The number of licensees grew from approximately 15–20 in 1962 to approximately 350 in 1970. In this time period, Brooksbank received approximately one-third of its out-of-town reservations from Budget's reservation offices in the three designated cities.

Problems developed as both the franchise system and the number of reservations grew. It became common for licensees to fail to transmit reservations, to transmit incomplete information, and to ask customers calling for reservations to call back when counter personnel were not busy. In response to these problems, Budget considered the development of a central computerized reservation system, featuring a single 800 number for taking and transmitting reservations. Other competitors in the automobile rental business were developing similar systems. Two firms, Telemax Corporation and International Reservation Corp., approached Budget, each offering to set up a central reservation system.

Budget received the endorsement of its advisory committee and licensees to proceed with such a system. Many licensees were already paying Budget for reservations received from its reservation offices. Telemax operated the central computerized reservation system from June 1970 to July 1971, when it declared bankruptcy. IRC took over operations in October 1971 and continued to perform reservation services until 1974, when it ceased operations due to large financial losses. Budget then decided to run the reservation system itself, operating it originally from Omaha, Nebraska, and later, in 1981, from Carrollton, Texas.

Throughout the process of centralization and computerization, Brooksbank insisted that it should receive, without charge, all reservations from any Budget reservation office, pursuant to the 1962 licensing agreement. Budget, to the contrary, insisted that its obligation to provide free reservations to Brooksbank was limited to the two-tier, telephone-based reservation system and is not applicable to the more sophisticated computerized system. To avoid litigation over this dispute, the parties entered into two trial agreements in 1970 and 1974, whereby Brooksbank paid the standard reservation charges applicable to all franchisees but was compensated for advertising and promotion expenditures in an amount approximating one-third of its costs relating to computerized reservations. Both parties agreed that Brooksbank could retain its rights under the 1962 agreement. When the 1974 agreement expired, Budget refused to extend any further reservation cost reductions to Brooksbank, contending that Brooksbank had had full opportunity to assess the benefits of the computerized reservation system and that other licensees were paying their full cost for reservations from the system. If Budget was obligated to provide cost-free reservations from a reservation system as it existed in 1962, a system using manually operated telephones with offices located in the three designated cities, Budget suggested that it was ready

to operate such a system exclusively for Brooksbank, to satisfy what it perceived to be its obligations under the 1962 agreement. Brooksbank refused to accept such treatment and brought the declaratory° judgment action to ascertain its rights under the 1962 licensing agreement.

The case proceeded through trial on theories essentially tracking the parties' positions since 1970. Brooksbank believed that interpretation and practical construction of the 1962 agreement mandated that it receive all of its reservations cost free from Budget reservation offices. At a minimum, it contended that both practical construction and the evidence supported a position that it receive, cost free, at least one-third of its reservations, the one-third figure comporting with the historical percentage of reservations coming from the three designated cities. Budget, in contrast, argued that the agreement allowed for free reservations from the two-tier telephone system in place in 1962; given technological changes since that time, Budget's obligations under the 1962 agreement were properly excused, and Brooksbank was therefore obligated, like all franchisees, to pay the standard reservation charges.

The trial court neither entirely excused Budget from providing Brooksbank with lower reservation charges nor allowed Brooksbank the minimum one-third percentage it thought it deserved by virtue of the 1962 agreement. Rather, the trial court concluded that the central computerized reservation system was not within the purview of the agreement relating to the reservation system and that the technology giving rise to the sophisticated system was not foreseeable in 1962. However, it concluded that Budget, as an incentive for Brooksbank to become a licensee, did intend to give Brooksbank free reservations from offices located in the three designated cities. The trial court finally concluded that Brooksbank was entitled to a 10% reduction in its computer reservation charges in lieu

of its contract rights. This result was based upon a finding of fact which assessed the benefits each party had received from the central computerized reservation system and which determined that Brooksbank deserved a 10% reduction in reservation costs. This figure, the trial court concluded, was "equitable in light of all the evidence presented at trial."

From our review of the 1962 agreement and the practical construction placed upon it by the parties, we conclude that Brooksbank is entitled to a one-third reduction in reservation costs. A question of interpretation and practical construction, necessary to a declaratory judgment action, begins with the language of the 1962 agreement (previously set forth) pertaining to the reservation system setup.[2]

The language expresses no agreement on what should happen during the course of the contract relationship with regard to technological changes. That such should be the case is not unusual, because parties form expectations with respect to only a limited number of situations, and only some of these expectations are in turn formulated as terms and reduced to contract language. Budget issued a standard form licensing agreement to Brooksbank, one which in 1962 contemplated the use of a two-tier telephone network to facilitate reservations.

 What omissions in language pose for interpretative duties of courts was cogently expressed by Judge Learned Hand: "[I]nterpretation more and more involves an imaginative projection of the expressed purpose upon situations arising later, for which the parties did not provide and which they did not have in mind." *L.N. Jackson & Co. v. Royal Norwegian Government,* 177 F.2d 694, 702 (2d Cir.1949) (dissenting opinion), *cert. denied,* 339 U.S. 914, 70 S.Ct. 574, 94 L.Ed. 1340 (1950); *see generally,* Farnsworth, *Disputes Over Omission in Contacts,*

---

2. The licensing agreement provides that "[a]ll questions of law arising under this contract shall be resolved in accordance with the laws of the State of Illinois." No significant distinc-

tions between Illinois and Minnesota law have been found on the general contract principles governing our discussion.

68 Colum.L.Rev. 860 (1968). The process of interpretation, moreover, can be supplemented by a practical construction of a contract, which has been defined as:

> [The parties'] conduct during the course of performance [which] may support *inferences* as to the meaning of language in the contract, or as to their intentions with respect to gaps or omissions in the contract.

Patterson, *The Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833, 836 (1964) (emphasis supplied).

Ascertaining the intentions of the parties with respect to reservation costs is necessarily difficult when the parties are involved in a long-term contract which does not specify the parties' agreement on the effect of changed circumstances. As one court has commented:

> Of course, where intent, though obscure, is nevertheless discernible, it must be followed; but a certain sophistication must be recognized—if we are to approach the matter frankly—where we are dealing with changed circumstances * * * with respect to a contract which does not touch this exact point and which has at most only points of departure for more or less pressing analogies.

*Parev Products Co. v. I. Rokeach & Sons, Inc.,* 124 F.2d 147, 149 (2nd Cir.1941).

With these principles in mind, we can examine the parties' various positions with respect to allocation of reservation costs. The most balanced review of the 1962 licensing agreement and the parties' performance under the agreement supports a one-third reduction for Brooksbank on its reservation costs for reservations coming from Budget's reservation center. This result reflects the bargain struck in 1962. In return for Brooksbank's participation in the franchise system, Budget offered free reservations from areas where it already had reservation offices: Chicago, New York, and Los Angeles. Since significant business traffic comes from these geographic areas, this is not an inconsiderable bargain. And, in fact, Brooksbank has historically received one-third of its reservations from these areas, which were to be serviced by Budget reservation offices. From other geographic zones, Budget was to pay the costs of reservations (*i.e.,* telephone charges in transmitting reservations) received from other licensees like Brooksbank. Even as Budget increasingly centralized its operations from 1962 to 1970, Brooksbank continued to receive free reservations from these geographic zones. It is this geographic, practical construction of the 1962 agreement that most closely comports with what we perceive to be the parties' intentions in entering into it.

■ Necessarily, then, we reject Brooksbank's contention that it is entitled to cost-free reservations from Budget's reservation center in Carrollton, Texas. This contention takes a simple view of the contract language outlined above and ignores the geographic, practical construction placed upon this language by the parties since the inception of their relationship. Allowing Brooksbank a 100% reduction in reservation costs would distort the bargain struck in the 1962 agreement, wherein the parties allocated reservation obligations according to markets serviced by each party.

■ Equally, however, we reject Budget's contention that it is entirely excused from giving Brooksbank any percentage reduction in reservation costs. This argument ignores the language of the agreement that each parties' obligations were to continue "during the existence of the [agreement]." From this language, and from the good faith covenant implied in contracts, we consider the agreement as one requiring continued cooperation regarding the allocation of obligations and the performance standards associated with a reservation system. Surely Budget could not let its reservation system stagnate over time. Budget did, in fact, work to improve its system by developing computerized operations. Brooksbank, in turn, operated a successful franchise, benefiting the Budget franchise system as a whole. Although the 1962 agreement may have omitted particular agreement about the effect of technological change on the franchise relationship,

that the parties were still bound by the agreement to preserve the bargain struck in 1962 cannot be disregarded. *See,* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L. Rev. 369, 380 n. 44 (1980).

To preserve Brooksbank's bargain, Budget remained bound to provide a continuing proportion of cost-free reservations, based upon the practical geographic construction placed by the parties upon the 1962 agreement. New technology may have altered the mode in which reservations were placed within the franchise system, but it did not alter the parties' essential bargain in apportioning reservation obligations based upon geographic markets.

We reject Budget's contentions that it is excused from performance under either a doctrine of impracticability of performance or frustration of purpose. These doctrines have at their core a requirement that some event must occur, the nonoccurrence of which was a basic assumption of the contract at the time it was made. *See,* Restatement (Second) of Contracts, §§ 261, 265 (1981). In this case, that requirement is not met. Budget did not limit its obligations to the reservation system in place at the time of the 1962 agreement, as our discussion on interpretation and practical construction of the agreement indicates.

Having determined that Brooksbank is not entitled to entirely cost-free reservations from Budget's reservation center and that Budget is not excused from delivering a percentage of cost-free reservations to Brooksbank, we now examine the trial court's conclusion that Brooksbank is entitled to a 10% reduction in reservation costs paid to Budget. The 10% figure derived from a judicial estimate of the benefit accruing to each party from the central computerized reservation system. The trial court apparently assessed the advantages of the computerized system and the release of Brooksbank from its obligation to forward reservations to other licensees in determining that Brooksbank, although entitled to some percentage reduction in reservation charges, should only receive a reduction proportionate to its lessened obligation.

The trial court, in so doing, has taken the position that interpretation of the agreement and the parties' course of performance entitled Brooksbank to a percentage reduction in some reservation costs. Although the trial court properly recognized that Brooksbank should receive a percentage reduction in some reservation costs, the court ordered only a 10% reduction, based solely on the statement that the figure was "equitable in light of all the evidence presented at trial." Absent any explanatory memorandum by the trial court, we are at a loss to understand how the trial court estimated the apportionment of reservation system costs under the changed circumstances of the parties.

The trial court's findings of fact do provide a more factually consistent way in which to analyze the proportionate discount in reservation costs to which Brooksbank is entitled. Historically, Brooksbank received approximately one-third of its reservations from those markets in which Budget promised to maintain reservation offices. The centralization and computerization of the reservation system worked to the benefit of both parties in expanding the desirability of Budget franchises, in increasing the efficiency of operations, and in solving problems encountered in the earlier reservation system. Both Budget and Brooksbank obviously benefit from these changes. Although Brooksbank may now have to place fewer reservations for other licensees, it must nevertheless pay Budget for those reservations it would have received at cost from other licensees. In this sense, the essential bargain of the parties remains intact: Budget pays for reservations which would have come from markets it promised Brooksbank to serve, and Brooksbank pays for reservations that it would have had to pay for at cost. A one-third reduction in reservation costs is more consistent with the evidence found by the trial court and with the essential agreement of the parties regarding reservation system obligations.

The trial court's declaratory judgment is accordingly modified.[3]

Costs and disbursements are allowed to neither party.

Affirmed as modified.

SIMONETT, Justice (dissenting).

I respectfully dissent. Since 1970, the provision in the 1962 contract that Brooksbank is to receive cost-free reservations from Budget Rent-A-Car's offices in New York City, Chicago and Los Angeles has been irrelevant to the manner in which the franchisees have handled reservations, and the contract clause cannot, in any meaningful sense, be implemented. In 1962 the parties never foresaw nor made allowance for a conversion to a centralized computer reservation system.

Can the 1962 contract clause nevertheless be enforced in some equivalent fashion? I do not see how this can be done by applying rules for construction of contract language. None of the rules apply, including the rule of practical construction. It may be that over the past 20 years some 30% of Brooksbank's reservations have continued to originate from the three designated cities, but this tells us nothing as to whether the parties intended those reservations to be cost-free. If we look to the "practical construction" the parties gave to the disputed contract clause, we find that the parties emphatically agreed to disagree.

There are strong, competing equities. Brooksbank points to his "sweat equity" and his contribution to making an initial risky enterprise stable and successful. Budget points out that in 1970 when it was essential to the survival of the business to convert to a central computer system, Brooksbank, unlike other major franchisees, refused to make concessions on the cost-free reservations clause in its contract.

It seems to me we are being asked not so much to construe a 1962 document as to arbitrate a dispute between business associates, both with substantial investments in an ongoing business of some 20 years and each needing the other. If the rules of contract construction can be applied, they should be; but where they are of no help, as here, and the parties refuse to bargain their differences, I believe a court may apply equitable principles. This is what the trial court apparently did here, granting a 10% reduction in reservation charges, but without giving its reasons. The majority of this court, applying rules of contract construction, believe a one-third reduction is proper. I agree a reduction is due Brooksbank. I would reverse and remand to the trial court with instructions to determine what should be a proper reduction in the reservation charges, considering the equities of the entire relationship, and, of course, to set out the reasons for its determination.

TODD, SCOTT and KELLEY, JJ., join in dissent.

---

**3.** We affirm the trial court's declaratory judgment insofar as it allows the reduction in computer reservations after October 1, 1979, and excludes travel agent and Air Inc. service charges.