**INTERNATIONAL TRAVEL ARRAN-GERS, a corporation, Plaintiff,**

**v.**

**NWA, INC.; Northwest Airlines, Inc., Republic Airlines, Inc., Mainline Travel, Inc.,[1] Defendants.**

Civ. File Nos. 3–86–0391, 3–87–534.

United States District Court,
D. Minnesota,
Third Division.

Oct. 5, 1989.

1. The pleadings and documents in the clerk's file have a number of different captions, listing additional defendants. However, the supplemental complaint filed on October 28, 1988, identifies only the defendants named here. The court assumes that the other defendants are no longer parties to this action.

Harold J. Tomin, Tomin & Anglin, Los Angeles, Cal., and Daniel R. Shulman, Nancy R. Menzel, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for plaintiff.

Ronald D. Eastman, David F. Williams, Michael B. Quigley, Cadwalader, Wickersham & Taft, Washington, D.C., and Peter S. Hendrixson, Mark B. Rotenberg, and Michael A. Lindsay, Dorsey & Whitney, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the court upon cross motions for summary judgment. De-

fendants seek summary judgment on all of plaintiff's claims. Plaintiff opposes defendants' motion and moves for summary judgment on its claims for breach of contract and breach of covenant of good faith and fair dealing. For the reasons set forth below the court grants these motions in part and denies them in part.

*Factual Background*

The plaintiff in this action, International Travel Arrangers (ITA), is a Minneapolis/St. Paul based wholesale tour operator. ITA operates charters from the Twin Cities to various vacation destinations. ITA commonly packages air travel with a number of ground amenities, such as hotel accommodations, and sells the packages to consumers through travel agencies.

The defendants are all members of the NWA, Inc. corporate family. Northwest Airlines, Inc. (Northwest) is the fourth largest scheduled airline in the United States. Northwest maintains its headquarters in Minneapolis/St. Paul. In addition to its scheduled service, offered directly to consumers, Northwest has chartered aircraft to ITA. Mainline Travel, Inc. (MLT) is a company engaged in the wholesale tour business. MLT was an independent corporation until it was acquired by NWA in October 1985. Republic Airlines, Inc. (Republic) was an independent scheduled airline until NWA acquired it in 1986.

MLT and ITA are the largest and second-largest Twin Cities-based tour operators respectively. Six other tour operators are based in the Twin Cities, and a number of other tour companies sell tours in the Twin Cities market. The relevant market for purposes of this litigation involves air transportation between Minneapolis/St. Paul (MSP) and various domestic and international destinations. More particularly, ITA complains of defendants' activities in the air vacation package market and the discretionary non-package market known as "visiting friends and relatives" (VFR). The city pairs at issue are MSP–Las Vegas (LAS), MSP–Hawaii, MSP–Phoenix (PHX), MSP–Orlando (MCO), MSP–Tampa (TPA), MSP–Ft. Meyer (RSW), MSP–Los Angeles (LAX), MSP–San Francisco (SFO), MSP–

San Diego (SAN), MSP–London, and MSP–Frankfurt (FRA).

ITA, MLT, and other tour operators are unique entities in that they are both customers and competitors of the scheduled airlines. Prior to December of 1972 charter companies were restricted in their ability to compete with regularly scheduled airlines. They operated primarily by chartering entire aircraft and selling seats to the public. Then, the Civil Aeronautics Board (CAB) approved the travel group charter concept and liberalized regulations upon charter companies. The actions of the CAB, and its successor the Department of Transportation (DOT), allowed tour operators to purchase blocks of seats on regularly scheduled air service and to resell the seats to the public. The tour operators usually sold air travel packages at a substantially lower price than the fares offered by the airlines to consumers for regularly scheduled flights to the same destination. This type of contract bulk fare arrangement, coupled with traditional charter arrangements, have allowed tour operators to compete more effectively with scheduled air carriers. In the past, ITA has utilized Northwest, Republic, and other carriers in purchasing charters and bulk seats.

In the early and mid–1980s the tour operator segment of the air transportation industry experienced strong growth. Major air carriers began to enter the business by forming their own in-house tour divisions. Northwest decided to get involved by acquiring an interest in a going concern. On May 27, 1985, NWA announced its intention to acquire MLT. NWA also intended to acquire Sun County Airlines, a small Twin Cities-based charter carrier, but abandoned this plan due to opposition from Sun Country shareholders.

On June 13, 1985, NWA filed a petition with the DOT requesting exemption from the provisions of the Federal Aviation Act that require formal DOT approval before such an acquisition may occur. In the alternative, NWA sought prior approval of the transaction. In the absence of opposition by ITA or anyone else, the DOT granted NWA's petition for exemption. The

DOT concluded that the acquisition was "not likely to have anticompetitive effects or to be otherwise inconsistent with the public interest." *Application of NWA, Inc.*, DOT Order 85–7–70 at 3 (July 30, 1985). The DOT noted, however, that "NWA has not requested, and will not receive, antitrust immunity for this transaction. The antitrust laws will, therefore, remain available as a remedy if NWA's acquisition later presents a threat to competition." *Id.*

In 1985 NWA also contemplated acquisition of Republic. At the time Northwest was primarily a long-haul domestic and international carrier and possessed a fleet of larger, long-range aircraft. Republic, in contrast, utilized mostly smaller, narrow-body aircraft on its shorter domestic "feeder" route system. On January 28, 1986, NWA and Republic applied to the DOT for approval of their merger. The DOT ordered that a trial be conducted before an administrative law judge. A number of parties participated in the proceedings, and the Department of Justice actively opposed the merger. ITA did not take part in the hearing. Based on the record of the hearing and the administrative law judge's recommendation, the DOT approved the transaction. *See Northwest–Republic Acquisition case*, DOT Order 86–7–81 (July 31, 1986).

During the mid–1980s ITA obtained the majority of its charter and bulk lift seats from Northwest. For example, during ITA's winter 1985 season (January–April 1985) Northwest provided over 65 percent of ITA's lift. ITA was Northwest's only tour operator charter during the winter 1985 season. ITA claims that it had a similar arrangement with Northwest for the winter 1986 season. ITA contends that while Northwest was contemplating acquisition of MLT, the defendants took a number of steps that breached the contractual arrangement between ITA and Northwest, violated the antitrust laws, constituted fraud, and deprived ITA of a prospective economic advantage.

Although the theories underlying ITA's complaint are distinct, the acts constituting the alleged wrongs are substantially the same for each claim. ITA asserts that Northwest conspired to put ITA out of business by launching a multi-pronged attack on ITA's winter 1986 program, and later by sabotaging ITA's summer 1988 program. At this time the court deems it unnecessary to describe each alleged act of wrongdoing, but a general description of ITA's allegations is necessary in order to put the claims in context.

In recent years the "hub and spoke" system has become the dominant mode of operation in the airline industry. In this system a carrier is based in one or more "hubs" that are connected to various destinations by "spokes." Flights between two cities ordinarily stop at the carrier's hub before proceeding to the final destination, but direct flights are common when one of the cities is a hub. Northwest is the only major airline with a hub at MSP. ITA contends that this fact, combined with Northwest's acquisition of MLT and Republic, has allowed Northwest to control the price and restrict the supply of air travel between MSP and certain cities. ITA claims that competition between MLT, Sun Country Airlines and Northwest has been virtually eliminated. Consequently, Northwest has been able to engage in a number of practices designed to reduce competition in general and to injure ITA specifically. Some of these actions also form the basis for ITA's other claims.

According to ITA, by spring of 1985 Northwest and ITA had reached an agreement whereby ITA would enjoy first call on all of Northwest's available wide-body aircraft for the winter 1986 season. Northwest disputes the existence of any contract to this effect, but ITA claims that the contract is memorialized in a letter from Stephen Russell, the president of ITA, to Fay Beauchine, Northwest's Director of Charter and Incentive Travel. Assuming that a contract existed, ITA claims that Timothy Skoog, Northwest's Director of Tour and Leisure Marketing, met with Russell on June 20, 1985, and forced Russell to agree to a number of contract modifications. Northwest allegedly coerced ITA into relinquishing its exclusive arrangement with

Northwest and sharing lift with MLT. ITA maintains that in the terms of the "agreement" reached on June 20 Northwest promised to treat ITA and MLT with parity with respect to both prices and departure times and to allow ITA to maintain its exclusive right to Orlando charters. Again, Northwest disputes the existence of any such contract.

ITA cites a number of specific acts by which Northwest breached its agreement. First, MLT allegedly received discount prices for seats on some of its charters. On the MSP–LAS charter, for example, Northwest charged MLT $12 per seat less than it charged ITA. Second, MLT obtained lift on MSP–LAS flights departing MSP in the mid-morning, a more desirable time than ITA charters. Finally, Northwest sold MSP–MCO (Orlando) charters to MLT, in violation of its exclusive arrangement with ITA. ITA contends that Northwest instituted these changes in order to hurt ITA, MLT's major competitor, and ultimately to drive ITA from the market.

ITA points to additional anticompetitive conduct in the spring of 1988. Both ITA and MLT announced the prices for their summer 1988 programs on March 29, 1988. Soon thereafter, MLT and Northwest allegedly conspired to slash prices on those travel packages that were comparable to the ones offered by ITA. ITA was forced to match prices, cancel programs to some cities and downgrade service to others. After ITA cancellations, MLT raised its prices again.

This cause of action has a somewhat complicated procedural history,[2] but for purposes of these motions the court must address the seven claims set forth in ITA's supplemental complaint:

1. Violation of § 7 of the Clayton Act (MLT Acquisition).
2. Violation of § 7 of the Clayton Act (Republic Acquisition).
3. Violation of §§ 1 and 2 of the Sherman Act.
4. Tortious Breach of the Duty of Good Faith and Fair Dealing.
5. Fraud.
6. Breach of Contract.
7. Interference with Contractual Relations and Prospective Economic Advantage.

Defendants' motion for summary judgment seeks dismissal of all of these claims. Plaintiff, on the other hand, requests summary judgment on its breach of contract claim and on defendants' fifth affirmative defense that plaintiff's antitrust claims are barred by collateral estoppel.

*Analysis*

In deciding cross-motions for summary judgment the court must apply the standards set forth in Fed.R.Civ.P. 56(c). Judgment shall be rendered for a moving party provided that the pleadings and materials on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The judge's function at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. at 2510. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

I. Antitrust Claims

ITA has brought antitrust claims against the defendants pursuant to sections 4 and

---

**2.** The original complaint in this action was filed in April of 1986. In it ITA challenged NWA's acquisition of MLT. ITA filed a second action in August of 1987 challenging the acquisition of Republic. The two actions were consolidated on December 15, 1987. ITA filed a supplemental complaint on October 28, 1988.

16 of the Clayton Act to recover damages and to obtain injunctive relief for defendants' alleged violations of sections 1 and 2 of the Sherman Act, and section 7 of the Clayton Act. Section 7 of the Clayton Act prohibits a corporation from acquiring another corporation where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In its first claim, ITA alleges that NWA's acquisition of MLT tended to lessen trade and to create a monopoly. ITA seeks damages under § 4 of the Clayton Act, which provides: "Any person who shall be injured in his business or property by reason of anything in the antitrust laws ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. ITA also seeks injunctive relief, including divestiture, under section 16 of the Clayton Act. 15 U.S.C. § 26. ITA's second claim challenges NWA's acquisition of Republic on the same grounds. ITA's third claim does not attack either acquisition per se. Instead, it alleges that the defendants have combined and conspired to restrain trade and monopolize air travel in the city pairs at issue, that defendants have attempted to monopolize such trade, and that they have in fact monopolized it, all in violation of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2.

### A. *Collateral Estoppel*

As a first line of defense against plaintiff's antitrust claims, defendants contend that the actions of the DOT, as reflected in the orders of July 30, 1985, and July 31, 1986, preclude ITA from attacking any of defendants' actions on antitrust grounds. While this argument has some merit, defendants' position with respect to the DOT orders is too broad. The court must evaluate each of ITA's antitrust claims separately in order to determine whether they are barred by the DOT orders.

#### 1. Northwest's Acquisition of Republic

■ The DOT order approving NWA's acquisition of Republic was issued under the authority of the Federal Aviation Act.

The Act mandates rejection of the transaction:

(A) if it would result in a monopoly or would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of air transportation in any region of the United States; or

(B) the effect of which in any region of the United States may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless the Board finds that the anticompetitive effects of the proposed transaction are outweighed in the public interest by the probable effect of the transaction in meeting significant transportation conveniences and needs of the public, and unless it finds that such significant transportation conveniences and needs may not be satisfied by a reasonably available alternative having materially less anticompetitive effects.

49 U.S.C.App. § 1378(b)(1).

All interested persons may participate in the approval process. In the instant case a number of parties took part, including eight other airlines and the Department of Justice. ITA did not formally participate. DOT approval is subject to review by the United States Court of Appeals for the District of Columbia. The District of Columbia Court has "exclusive jurisdiction" to review DOT determinations. 49 U.S.C. App. § 1486(d). No appeal from the July 31, 1986, DOT order was taken.

Defendants argue that ITA had an opportunity to challenge the Republic acquisition in the administrative proceedings and that it is precluded from relitigating the identical issues in another forum. In the case of *Fischer v. NWA, Inc.,* slip op. (D.Minn. June 9, 1988), *aff'd on other grounds,* 883 F.2d 594 (8th Cir.1989), Chief Judge Donald D. Alsop embraced NWA's argument. In *Fischer* a regional airline company, Fischer Bros. Aviation (Fischer), had provided connecting flight service for Northwest at Detroit, Michigan. Simmons Airlines, Inc. (Simmons) had provided similar service for Republic. After NWA ac-

quired Republic, Northwest chose to use Simmons as its exclusive regional airline in Detroit. Fischer filed suit asserting antitrust and common law claims. Judge Alsop granted summary judgment for NWA on the antitrust claims. He reviewed Eighth Circuit and Supreme Court precedent regarding the effect of provisions which mandate exclusive review of administrative decisions in the United States Courts of Appeals. *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) (State may not collaterally attack Federal Power Commission's grant of a license.); *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970) (order of Federal Maritime Commission not subject to collateral attack); *North American Savings Ass'n v. Federal Home Loan Bank Board*, 755 F.2d 122 (8th Cir.1985) (district court lacks jurisdiction to review approval of branch offices by FSLIC and Federal Home Loan Bank Board). Judge Alsop extended the teaching of these cases to § 1486, concluding

> Plaintiffs' claims challenging the lawfulness of the Republic acquisition on antitrust grounds are essentially the same issues resolved by the CAB in the administrative proceeding from which appeal was not taken. Certainly, [Fischer] had a "substantial interest" in the approval within the meaning of the Act. Accordingly, the holding of *City of Tacoma* and *Marine Terminal* encompass the facts of the present case and preclude the plaintiffs from collaterally attacking the acquisition. This is so, despite the fact that plaintiffs chose not to participate in the administrative proceeding.

*Fischer*, slip op. at 10 (footnote omitted).

Although the majority opinion on appeal in *Fischer* does not address the issue of collateral estoppel, Judge Earl R. Larson's dissent does. Judge Larson criticizes Judge Alsop for failing to consider the effect of the DOT's decision not to grant antitrust immunity to NWA with respect to the Republic transaction. The DOT has the authority, when it approves an airline acquisition, to grant any affected party exemption from operation of the antitrust laws. Because the DOT did not grant immunity to NWA, Judge Larson would allow an antitrust action challenging the acquisition to go forward.

Since Judge Larson's dissent did not sway the majority of the panel, his opinion is not binding upon this court. However, ITA relies on Judge Larson's analysis of the history and purposes of § 1384 to argue that Judge Alsop's decision in *Fischer* was incorrect. The court disagrees. Judge Larson's analysis of the history and purposes of § 1384 is sound, but his conclusion, that all issues decided by the DOT are open to challenge in an antitrust action, is unwarranted. Judge Alsop's approach, which protects the DOT's approval of the acquisition while allowing plaintiffs to challenge post-merger anticompetitive conduct, gives due respect for both the role of the DOT in approving mergers once and for all and the rights of injured parties to obtain redress for antitrust violations.

Section 1384 was enacted in 1978 along with amendments to the Federal Aviation Act. Prior to 1978, CAB approval of an airline acquisition automatically conferred antitrust immunity on the transaction. The Supreme Court had liberally construed this grant of immunity, and in *Hughes Tool Co. v. TWA, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the Court extended immunity farther than the CAB itself intended. In response, Congress considered legislation to limit the scope of antitrust immunity. Judge Larson cites language from the legislative history that is instructive. He notes that the amendments were designed to allow the CAB "to approve transactions for transportation purposes, but still refrain from conferring antitrust immunity on any or all aspects of the transaction." S.Rep. No. 95–631, 95th Cong. 2d Sess. 84–85 (1978), *quoted in Fischer*, 883 F.2d at 607 (Larson, J. dissenting). Further elaborating, one of the sponsors of the amendment stated

> the Board could, if it chose, approve of activities that it would not immunize.... The Board will not have to always choose

between disapproval and antitrust immunity, and the parties will know that they cannot misbehave after initial approval and expect to use a Federal law as a shield against antitrust liability.

124 Cong.Rec. 10687 (April 18, 1978) (remarks of Sen. Kennedy). The House version embodied a similar concern about broad antitrust immunity. As Judge Larson observes, "the House bill conditioned any grant of immunity on the affirmative finding by the Board that such immunity was in the public interest." *Fischer*, 883 F.2d at 607 (Larson, J. dissenting) (citing H.Rep. No. 95–1211, 95th Cong.2d Sess. 18 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 3737, 3754.) Congress ultimately adopted the House version. *See* House Conf.Rep. No. 95–1779, 95th Cong. 2d Sess. 78 (1978), *reprinted* in 1978 U.S. Code Cong. & Admin.News 3737, 3773, 3792.

The court need not expose the decision of the DOT to challenge in order to fulfill the purposes of § 1384. The availability of remedies for post-merger anticompetitive activities insures that the parties involved will not be able to misbehave with impunity. On the other hand, the parties should not be subject to fear that DOT approval will be overturned and the acquisition undone. Out of respect for the administrative procedure described in the Federal Aviation Act and the exclusive review provisions set forth therein, this court must uphold the finality of the July 31, 1986 order. Therefore, ITA's second claim challenging the NWA/Republic merger itself must be dismissed.

### 2. The MLT Acquisition

■ The DOT's July 30, 1985 order is not entitled to the same deference. In exempting the MLT acquisition from the approval process, the DOT did not conduct a hearing or employ the searching analysis that characterized the Republic proceeding. No parties opposed NWA's request for exemption. Significantly, the DOT order states that NWA will not receive antitrust immunity for the transaction. The order further announces that the antitrust laws will "remain available as a remedy if NWA's acquisition later presents a threat to competition."

Defendants cite no case law in support of their contention that exemptions under 49 U.S.C.App. § 1386 of the Federal Aviation Act have the same preclusive effect as DOT orders approving acquisitions pursuant to § 1378. The DOT exempted the MLT acquisition from the formal review process on the basis of 14 C.F.R. § 380.44, which provides

Air carriers ... are hereby relieved from section 408(a), 409, and 412 of the Federal Aviation Act of 1958, as amended, to the extent necessary to permit them to acquire, control, have interlocking relationships with, or market charter tours in conjunction with charter operators, but only so long as they comply with the provisions of this part and the conditions imposed herein.

The regulation does not say that such acquisitions are immune from the antitrust laws. The federal policy of maintaining healthy competition in the marketplace, which undergirds the antitrust laws, compels a close look at the challenged acquisition, regardless of whether the DOT has granted an exemption. A number of important factual disputes must be resolved in order for this to occur. Accordingly, summary judgment on ITA's first antitrust claim is not appropriate.

### 3. Sherman Act Claims

■ ITA's third claim alleges violation of sections 1 and 2 of the Sherman Act. In particular, ITA contends that the defendants combined and conspired to monopolize, attempted to monopolize, and did in fact monopolize one or more lines of trade or commerce. Defendants respond that this claim, like the other antitrust allegations is barred by the DOT orders. This court's finding that the MLT acquisition may be challenged undermines defendants' argument. However, even if the court had not made this finding, plaintiff would have a right to bring its Sherman Act claims. Any other conclusion would render the 1978 amendment to the Federal Aviation Act meaningless. It would encourage precisely the evil of which Judge Larson

warned in his *Fischer* dissent. Once the parties obtained DOT approval of an acquisition, they would be free to engage in all sorts of anticompetitive behavior with impunity. On this point Judge Alsop and Judge Larson are in agreement, because Judge Alsop's opinion in *Fischer* addresses the sufficiency of the plaintiffs' Sherman Act claims on the merits. Although Judge Alsop dismissed the claims, he did not rule that they were barred by collateral estoppel. The reasoning of Judge Larson and the ruling of Judge Alsop compel a similar analysis of ITA's Sherman Act claims in this case.

### B. *Antitrust Injury*

■ In *Fischer* the Eighth Circuit recently reaffirmed the need for a plaintiff to establish "antitrust injury" in order to avoid dismissal of its antitrust claims. The court cited language from *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), which required that antitrust plaintiffs

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove an *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

The *Fischer* majority also relied on *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir.1983), which held that an antitrust plaintiff must establish that there was "proximate causation between plaintiff's harm and the alleged illegal market restraint." Both *Fischer* and *McDonald* declare that a plaintiff lacks standing to bring an action under the Clayton Act unless it can establish antitrust injury. The proper inquiry involves "an evaluation of the plaintiffs' harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* (citing *Associated General Contractors of California v. California State Council of Carpenters*, 459

U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983)).

The crux of the problem in *Fischer* was that Fischer was neither a customer nor a competitor of Northwest. Fischer was not forced to pay monopoly prices nor was it hampered from competing with Northwest by Northwest's exercise of monopoly power. Rather, Fischer claimed to have suffered damage when Northwest terminated Fischer's exclusive regional carrier arrangement. The court stated, "We conclude that Fischer's termination was not caused by anticompetitive conduct or an anticompetitive effect of conduct; rather, it was caused by Northwest's need to avoid employing two regional airlines where only one was required." *Fischer*, 883 F.2d at 600.

The court's conclusion in *Fischer* is consistent with *Brunswick*, in which three bowling centers had complained that the petitioner's acquisition of several financially troubled bowling centers had violated the Clayton Act. The respondents argued that absent petitioner's acquisitions, the failing bowling centers would have collapsed, and the respondents would have enjoyed increased profits. The court rejected respondents' claims, stating that the antitrust laws "were enacted for 'the protection of *competition* not *competitors*.'" *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). At heart, respondents' action sought protection from increased competition. Therefore, the Court concluded that "if respondents were injured, it was not 'by reason of anything forbidden in the antitrust laws'...." *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697.

In the Eighth Circuit *McDonald* enumerates the factors to be considered in determining whether a plaintiff is a proper party to bring a private antitrust action:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between

the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicative recovery or complex damage apportionment.

722 F.2d at 1374. In *McDonald* the plaintiffs had owned a corporation that designed and manufactured transcutaneous electronic nerve stimulators (TENS). The defendant bought plaintiffs' stock in the company and hired the plaintiffs. As a part of the deal, plaintiffs entered into covenants not to compete with the defendant. Defendant successfully marketed the TENS devices and experienced a substantial growth in sales but suffered aggregate operating losses. The defendant ultimately demoted the plaintiffs, who subsequently either left the company or were terminated. Since the defendant incurred losses on the TENS units, it was able to avoid additional payments to the plaintiffs under the original stock purchase agreement. The plaintiffs brought an antitrust action alleging that defendant had suppressed the TENS market. They prevailed in the district court, but the court of appeals reversed because the plaintiffs had failed to demonstrate a link between the alleged injury to competition and the alleged harm to the plaintiffs. Because the plaintiffs had voluntarily surrendered their status as actual or potential competitors, they could not complain of their inability to compete.

*McDonald, Brunswick* and *Fischer* are all distinguishable from the case at hand. ITA claims that it is both a customer and a competitor of Northwest. ITA alleges that, as a result of MLT and Republic acquisitions, Northwest is in a position to control both price and seat availability for air travel from Minneapolis/St. Paul to certain cities. Moreover, Northwest allegedly used its power to compete unfairly with ITA in an attempt to drive ITA out of business. As proof, ITA cites Northwest's assault on ITA's winter 1986 program. ITA claims that Northwest cut back the bulk lift available to ITA, and then gave preferential treatment to MLT with respect to price and departure time. ITA was forced to modify or eliminate some of its offerings.

In terms of the *McDonald* factors, ITA has made a sufficient showing with respect to improper motive and a causal connection between the harm to ITA and the alleged antitrust violations. Furthermore, in enacting the antitrust laws, Congress sought to prevent a single corporation from exercising control over both price and quantity available in a relevant market. The impact on ITA is directly related to the alleged market restraint as well. The only area in which ITA's claim is suspect is the difficulty of assessing damages. As the defendants point out, ITA has enjoyed substantial profits during the time period at issue. By no stretch of the imagination has ITA been "driven from the market." Nevertheless, ITA contends that it lost a significant amount of business due to defendants' anticompetitive conduct. ITA need not cease to exist as Northwest's competitor before bringing an antitrust action. Weighing all of these factors, the court finds that ITA has sufficiently alleged antitrust injury and has supported its claims with enough competent evidence to create issues of fact for a jury to decide. In short, ITA has standing to bring its antitrust claims.

### C. *Sherman Act Claims*

 In a final attack on ITA's antitrust claims, defendants contend that ITA's allegations under sections 1 and 2 of the Sherman Act have no basis. First, defendants cite *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), in which the Supreme Court held that for purposes of § 1 of the Sherman Act it is impossible for a parent corporation to conspire with its wholly owned subsidiary. *Id.* at 771, 104 S.Ct. at 2741 ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.") Defendants argue that Northwest could not have conspired with MLT, as ITA alleges. *Copperweld* does not, however, address the question of whether a corporation may be guilty of violating § 1 by conspiring with a prospective subsidiary during the time prior to acquisition. In the present case ITA claims that Northwest

gave MLT preferential treatment long before the October 1985 merger. Indeed, much of the conduct of which ITA complains occurred in the spring of 1985. In *Copperweld* the Court stated that "[i]f a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests...." *Id.* The same is not true here, because plaintiff asserts that Northwest granted MLT preferential treatment prior to their merger.

The Supreme Court has recognized a "basic distinction between concerted and independent action" in Sherman Act cases. *Id.* at 767, 104 S.Ct. at 2739 (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984)). Single firms are subject to Sherman Act scrutiny only when they pose a danger of monopolization. When a conspiracy is alleged, however, "it is not necessary to prove that concerted activity threatens monopolization." *Copperweld*, 467 U.S. at 768, 104 S.Ct. at 1473. The court finds that genuine issues of material fact exist with respect to the anticompetitive nature of Northwest's contacts with MLT before the merger. Therefore, defendants' motion for summary judgment on ITA's § 1 claims is denied.

■■■ Defendants also challenge plaintiff's claims of monopolization and attempt to monopolize under § 2 of the Sherman Act. The offense of monopoly has two elements: (1) possession of monopoly power in the relevant market and (2) willful acquisition of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966); *Superturf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1279 (8th Cir.1981); *H.J., Inc. v. International Telephone & Telegraph Corp.*, 867 F.2d 1531, 1537 (8th Cir.1989). In order to prove an attempt to monopolize claim, plaintiff must show that defendants

(1) specifically intended to control prices or destroy competition in some part of commerce; (2) engaged in predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *H.J., Inc.*, 867 F.2d at 1540–41.

In opposition to ITA's monopolization claims, defendants correctly state the legal standards regarding predatory pricing. In the Eighth Circuit prices above fully allocated cost (average total cost) are not anticompetitive, and prices above average variable cost are presumptively legitimate. *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1346 (8th Cir.1987). In the case at hand ITA does not accuse the defendants of pricing below average variable cost. However, ITA claims that Northwest offered seats on certain routes to MLT at less than average total cost. In addition, Northwest allegedly controlled the supply of seats available on these routes to the extent that ITA was unable to secure meaningful alternatives. The court finds that ITA has provided sufficient evidence so that, if viewed in the light most favorable to the plaintiff, a reasonable jury could find for ITA on its Sherman Act § 2 claims. Therefore, defendants' motion for summary judgment on these claims must be denied.

## II. Common Law Claims

### A. *Breach of Contract*

■■■ ITA's sixth claim alleges that Northwest, and Northwest alone, breached two contracts with ITA. The first contract allegedly was negotiated in the spring of 1985 and is memorialized in a letter from Russell of ITA to Beauchine of Northwest dated May 6, 1985. According to ITA, this agreement gave ITA first call on all lift available on Northwest flights for the winter 1986 season. ITA contends that Northwest breached this contract by forcing ITA to give up its exclusive arrangement and share lift with MLT for the winter of 1986. ITA argues that it acceded to these contract modifications under duress in the June 20, 1985 meeting between Russell and Skoog of Northwest.

In the alternative, ITA claims that the renegotiations which occurred on June 20 formed a second contract. This contract is

memorialized in four separate Passenger Aircraft Charter Agreements (PACAs). Northwest allegedly breached this second contract by giving MLT preferential treatment. Although ITA's complaint is unclear in this regard, the memoranda filed on behalf of ITA indicate that Northwest did not violate the letter of the four PACAs. Instead, ITA complains that Northwest's treatment of MLT violated the covenant of good faith and fair dealing implied in the PACAs because it deprived ITA of the benefit of its bargain. This second breach of contract count actually falls under the third claim in ITA's complaint for "tortious breach of the duty of good faith and fair dealing." It will be addressed in a separate discussion below.

With respect to ITA's first breach of contract claim, Northwest contends that it is barred by the parol evidence rule. According to Northwest, the entire contractual agreement between ITA and Northwest for the winter of 1986 is contained in the four PACAs, and ITA may not alter the terms of the contracts by citing a prior agreement. The purpose of the parol evidence rule is to encourage parties to include all prior and current agreements relating to a certain subject in one written agreement. As the Minnesota Supreme Court stated in *Hruska v. Chandler Associates, Inc.*, 372 N.W.2d 709, 713 (Minn. 1985), "the parol evidence rule seeks to minimize the risk of future litigation by encouraging parties to put their entire agreement in writing, providing that when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." (citation omitted).

The PACAs appear to be comprehensive. Moreover, they each contain the following clause:

> This Agreement ... [s]upersedes all prior agreements, representations or understandings between the parties, oral or written, with respect to the same subject matter, and fully sets forth the understanding of the parties with respect to the subject hereof. . . .

Normally this type of integration clause, combined with the policies underlying the parol evidence rule, would preclude any contract claim based on the existence of prior agreements. The parol evidence rule does contain exceptions, however, and ITA argues that its claim falls squarely within one of them. ITA asserts that the timing of the contract modifications and the market power possessed by Northwest deprived ITA of the opportunity to find serious alternatives for its winter 1986 program. In this "take it or leave it" situation ITA acquiesced and "agreed" to the contract modifications. It is well-settled that duress may invalidate certain terms of a contract or may void the contract altogether when an agreement is coerced by unlawful threats. *Bond v. Charlson*, 374 N.W.2d 423, 428 (Minn.1985); *St. Louis Park Investment Co. v. R.L. Johnson Investment Co., Inc.*, 411 N.W.2d 288 (Minn. Ct.App.1987). This case is in part an antitrust action, in which ITA claims that Northwest exercised monopoly power. Although evidence of actual duress is slim, the court is not able to conclude that no genuine issues of material fact remain on this score. Accordingly, it would be inappropriate to grant summary judgment on ITA's claim for breach of contract.

## B. *Tortious Breach of the Duty of Good Faith and Fair Dealing*

In *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 790 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976), the Minnesota Supreme Court ruled that no independent tort action exists for bad faith breach of contract. *See also Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443, 452 (Minn.1980) ("A malicious or bad faith motive in breaching a contract action does not convert a contract action into a tort action."); *Kramer v. Bruns*, 396 N.W.2d 627, 631 (Minn.Ct.App.1986) ("bad faith termination of a contract is not an independent tort"). Recognizing this, ITA seeks contractual damages for breach of the covenant of good faith and fair dealing implied in the four PACAs. Plaintiff relies primarily on three Minnesota cases. The language of the cases appears to support

plaintiff's position, but a close reading of the cases reveals that Minnesota does not recognize a cause of action for breach of a covenant of good faith and fair dealing independent from an underlying breach of contract claim.

In the first case, *Haase v. Stokely–Van Camp, Inc.*, 257 Minn. 7, 99 N.W.2d 898 (1959), a corn grower brought an action against a canning company for breach of contract. The defendant had agreed to purchase the plaintiff's crop, but delivery was to be made "in such manner, condition and time as the Company may direct." 99 N.W.2d at 900. Ultimately, the defendant refused to purchase the plaintiff's sweet corn because it had become too mature. Although the canning company did not violate the literal terms of the agreement, the court affirmed a verdict in favor of the plaintiff because the defendant had induced the breach by its own actions. The court stated,

> In a contract of this kind, good faith on the part of both contracting parties must be implied. Where one of the contracting parties makes it impossible for the other to perform, he should not be permitted to take advantage of his own action in so doing.

*Id.* at 902 (footnote omitted). The Court did not rule that the corn grower prevailed on an independent claim of breach of a duty of good faith and fair dealing. Rather, it held that the corn grower could use the implied contractual promise to act in good faith in order to defeat canning company's defense that plaintiff failed to perform.

In the second case, *American Warehousing v. Michael Ede Management*, 414 N.W.2d 554 (Minn.Ct.App.1987), the Minnesota Court of Appeals affirmed a trial court decision to grant summary judgment dismissing plaintiff's claim that the defendant had breached a distributorship agreement and the covenant of good faith and fair dealing implied therein. Relying on *Haase*, the court stated, "In every non-sales contract there is an implied covenant of good faith and fair dealing which requires that one party not make it impossi-ble for the other party to perform the contract." *Id.* at 557 (citations omitted). Again, the court did not recognize an independent cause of action or claim for damages for breach of a covenant of good faith and fair dealing.

Finally, plaintiff cites the case of *J.J. Brooksbank Co. v. Budget Rent–A–Car*, 337 N.W.2d 372 (Minn.1983). The case involved a dispute between a rental car company and its franchisee. Due to technological advances, the rental car company had restructured its reservation system. As a result, the company was no longer willing to honor its previous arrangement by which the franchisee received reservations free of charge. The issue for decision was whether the trial court had erred in interpreting the contract. The Supreme Court used the concept of an implied covenant of good faith to interpret the ambiguity in the contract which resulted from the technological change. *Id.* at 376. No such ambiguity exists in the PACAs.

Having considered the relevant case law, the court concludes that ITA has no independent cause of action for breach of the duty of good faith and fair dealing. Since ITA does not claim that the terms of the PACAs have been breached, the fourth claim in ITA's supplemental complaint must be dismissed.

### C. *Fraud*

In Minnesota a plaintiff must prove eleven elements in order to establish a fraud claim:

(1) There must be a representation;

(2) That representation must be false;

(3) It must have to do with a past or present fact;

(4) That fact must be material;

(5) It must be susceptible of knowledge;

(6) The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;

(7) The representer must intend to have the other person induced to act, or justified in acting upon it;

(8) That person must be so induced to act or so justified in acting;

(9) That person's action must be in reliance upon the representations

(10) That person must suffer damage; and

(11) That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

*Davis v. Re–Trac Manufacturing Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967); *Florenzano v. Olson*, 387 N.W.2d 168, 174 n. 4 (Minn.1986).

Defendants contend that plaintiff's fraud claims are flawed because the alleged representations do not have anything to do with past or present fact. Instead, the representations were mere promises or predictions of what would happen in the future. If so, they are insufficient to support a fraud claim because "a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." *Vandeputte v. Soderholm*, 298 Minn. 505, 216 N.W.2d 144, 147 (1974). However, the court in *Vandeputte* went on to say that a misrepresentation of present intention may form the basis for a fraud claim, provided that "the promisor had no intention to perform at the time the promise was made." *Id.*

The court need analyze only one of the alleged misrepresentations in the case at hand to demonstrate that ITA's fraud claims are not ripe for summary judgment. ITA alleges that on June 20, 1985, Skoog stated that ITA and MLT would be treated equally with respect to departure times and price on the MSP–Las Vegas charters. The statement is a representation of present intention, and it is entirely possible that Skoog did not intend to fulfill the promise even as he spoke it. Indeed, ITA has presented evidence in support of its claim that by June 20 Northwest had already formulated a plan to drive ITA out of business. Viewed in the light most favorable to the plaintiff, this evidence could also convince a jury that Skoog never intended to perform in accordance with his promise. The fraud claim, therefore, will not be dismissed.

### D. *Interference with Contractual Relations and Interference with Prospective Economic Advantage*

ITA's final claim alleges that NWA and MLT interfered with contractual relations between ITA and Northwest and interfered with ITA's prospective economic advantage by sabotaging its winter 1986 program. The elements of a claim for interference with contractual relations are the same as the elements required for inducing a breach of contract. *Aslakson v. Home Savings Association*, 416 N.W.2d 786 (Minn.Ct.App.1987). The five elements for these claims are set forth in *Royal Realty Co. v. Levin*, 244 Minn. 288, 69 N.W.2d 667 (1955). The plaintiff must establish: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." *Id.* 69 N.W.2d at 671 (footnote omitted).

Defendants challenge the sufficiency of plaintiff's claim in two respects. First, defendants contend that no contract existed for the winter 1986 season until the PACAs were signed. As discussed above with respect to the breach of contract claim, the court is not satisfied that no genuine issues of fact remain regarding the existence of a prior contract. Thus, plaintiff has met its burden of establishing the existence of a contract for purposes of this motion.

Second, defendants contend that neither NWA nor MLT could have interfered with a contract between ITA and Northwest. With regard to NWA, defendants are correct. NWA, as the parent company of Northwest, was able to control Northwest to the extent that NWA cannot be considered a third party capable of interfering with ITA/Northwest contracts. ITA complains of the actions of some NWA officers, but these persons (such as Steven Rothmeier) also held positions with Northwest. "Officers of a corporation may not be held personally liable for interference with a contract merely for causing the corporation not to perform the contract." *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn.1982) (citations

omitted). MLT, on the other hand, was separate from Northwest at the time Northwest allegedly breached its contract giving ITA first call for lift on its flights. Genuine issues of material fact exist which preclude summary judgment on the claim against MLT.

■ Even if an exclusive contract between ITA and Northwest did not exist, MLT still could be liable for interference with prospective contractual relations. The Minnesota Supreme Court recognized this tort in *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628 (1982). In doing so, the Court was careful to protect lawful competition. The Court cited with approval § 766B of the Restatement (Second) of Torts, which provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of
>
> > (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> >
> > (b) preventing the other from acquiring or continuing the prospective relation.

*Id.* at 633.

The key is that the interference must be "intentional and improper." Defendants contend that Northwest offered lift to MLT merely as a result of, and in furtherance of, vigorous competition. This, defendants assert, is not improper. The Restatement provides that interference with a prospective contractual relation is not improper if:

> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768.

The problem in the case at hand is that ITA claims that MLT's action created an unlawful restraint of trade. Specifically, ITA accuses MLT of concerted activity in violation of § 1 of the Sherman Act. This claim is still alive in this case. Therefore, ITA's claim for interference with prospective contractual relations must remain as well.

Accordingly, IT IS ORDERED that:

1. Plaintiff's motion for partial summary judgment shall be, and hereby is, DENIED in its entirety.

2. Defendants' motions for summary judgment on plaintiff's second and fourth claims shall be and hereby are, GRANTED.

3. Defendants' motions for summary judgment on plaintiff's first, third, fifth and sixth claims shall be, and hereby are, DENIED.

4. Defendants' motion for summary judgment on plaintiff's seventh claim shall be, and hereby is GRANTED as to NWA and DENIED as to MLT.